**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2415-16T7

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

C.W.,[1]

    Defendant-Respondent.

_____

> **APPROVED FOR PUBLICATION**
>
> **March 21, 2017**
>
> **APPELLATE DIVISION**

Argued March 13, 2017 — Decided March 21, 2017

Before Judges Sabatino, Nugent and Haas.

On appeal from Superior Court of New Jersey, Law Division, Ocean County, Docket No. W-2017-000015-1516.

Samuel J. Marzarella, Chief Appellate Attorney, argued the cause for appellant (Joseph D. Coronato, Ocean County Prosecutor, attorney; Mr. Marzarella, of counsel; John C. Tassini, Assistant Prosecutor, on the briefs).

Laura B. Lasota, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Ms. Lasota, of counsel and on the briefs).

_____

[1] We use initials to protect the identity and privacy of the alleged victim, a minor, who resides in close proximity to defendant.

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey, attorneys; Mr. Shalom, Edward L. Barocas and Jeanne LoCicero, on the brief).

Claudia Joy Demitro, Deputy Attorney General, argued the cause for amicus curiae Office of Attorney General (Christopher S. Porrino, Attorney General, attorney; Ms. Demitro, of counsel and on the briefs).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This appeal by the State from a denial of its motion for defendant C.W.'s pretrial detention presents several legal issues arising under the new Bail Reform Act, N.J.S.A. 2A:162-15 to -26 ("the Act"), which became effective on January 1, 2017.

The novel issues posed to us include: (1) the proper standards of appellate review for assessing a trial court's decision to detain or release a defendant under the Act; (2) the analytic impact of a defendant's juvenile record, a facet that is not numerically reflected in a defendant's risk-assessment scores; (3) the significance to the detention analysis of a defendant's tier classification under Megan's Law; and (4) whether a recommendation by the Judiciary's Pretrial Services Program to detain a defendant creates, under the recently-enacted Rule 3:4A(b)(5), a rebuttable presumption against release that such a defendant must overcome.

For the reasons amplified in this opinion, we construe the Act and the associated provisions within Rule 3:4A as follows.

First, we adopt the agreed-upon position of the parties and the amici that the scope of appellate review of a detention decision generally should focus on whether the trial court abused its discretion, but de novo review applies with respect to alleged errors or misapplications of law within that court's analysis.

Second, we conclude that a defendant's prior history of juvenile delinquency and probation violations is a permissible — and at times especially significant — consideration in the detention analysis. Such consideration of a defendant's juvenile record is authorized by the Act, as it is logically subsumed within the factors set forth in N.J.S.A. 2A:162-20(c)(1).

Third, in appropriate cases, a detention analysis under the Act should afford considerable weight to the tier classification of a defendant who has previously committed a sexual offense subject to Megan's Law, N.J.S.A. 2C:7-1 to -23, and whose dangerousness and risk of re-offending have been evaluated on a Registrant Risk Assessment Scale ("RRAS"). Such a Megan's Law tier classification falls within the broad terms of N.J.S.A. 2A:162-20(c)(1). The Megan's Law tiering is particularly

salient where a defendant has been classified in "Tier 3" corresponding to the highest risk of re-offense, and where the pending charges involve new sexual offenses.

Fourth, we reject the argument that a Pretrial Services recommendation to detain a defendant creates, under Rule 3:4A(b)(5), a rebuttable presumption against release that a defendant must overcome. However, as the Rule expressly states, such a recommendation to detain may be, but is not required to be, relied upon by the court as "prima facie evidence" to support detention.

Notably in this regard, the Acting Administrative Director of the Courts recently announced in a March 2, 2017 guidance memorandum[2] that the standard "two-part" format of recommendation, which had been used by the Pretrial Services Program for the most serious cases (and which was used in this case), is being discontinued. That memorandum further clarified that the two-part format was not intended by the Judiciary to convey a recommendation that equally valued the options of (1) detention or (2) release upon stringent conditions. Instead, the two-part format was meant to convey that detention was the

---

[2] See Acting Admin. Dir. of the Courts Memorandum, "Criminal Justice Reform — Amendment of the Decision Making Framework to Clearly Indicate No Release Recommended for the Highest Level of Risk Defendant" (March 2, 2017).

preferred option, but if the trial court rejected that primary recommendation, then stringent conditions of release alternatively should be imposed.

Lacking the guidance of the Administrative Director's recent clarifying memorandum, as well as subsequent published case law on legal issues arising under the new statute[3], the trial court rejected the State's motion to detain C.W. Instead, the court released him on specified conditions, which it made more stringent after learning of defendant's close proximity to the residence of the minor.

The trial court found that the State had not met its burden for detention under the Act. The court reached that conclusion in spite of defendant's troubling prior record of sexual wrongdoing as a juvenile, his two violations of probation that caused the Family Part to order him confined for three years in a juvenile detention facility, his highest-level Tier 3 classification under Megan's Law, and his close proximity to the minor's residence.

---

[3] See State v. Ingram, ___ N.J. Super. ___ (App. Div. 2017) (generally allowing the State to establish probable cause at the detention hearing through a written proffer rather than through testimony); State v. Robinson, ___ N.J. Super. ___ (App. Div. 2017) (clarifying the State's discovery obligations in connection with the detention proceeding), leave to appeal granted, ___ N.J. ___ (2017).

The trial court appears to have afforded significance to defendant's low numerical risk-assessment scores on the failure-to-appear and new criminal activity indices. However, both of those scores do not take into account the fact that defendant has been confined in a juvenile facility for several years. In addition, the trial court's decisions do not explain specifically why it rejected the portion of the Pretrial Services recommendation of detention, despite the Act's requirement for such a written explanation.

We further note that there are material informational gaps in the existing record, such as the details relating to defendant's two violations of probation and also his Megan's Law classification. These gaps impede a full and appropriate consideration of the issues in this case as well as our own appellate review.

For these and other reasons explained in this opinion, we remand this matter to the trial court for expeditious reconsideration of its ruling.

I.

We derive the pertinent facts, in part, from the State's allegations, mindful that this case is only in the pretrial phase. Fundamentally, the State contends that defendant C.W., who is presently twenty years old, attempted on two different

dates in 2016 to engage in sexual activities with a minor female. The minor reportedly lives nearby defendant and his parents in Ocean County.[4]

### The Charged Offenses and the State's Investigation

According to the State, in May 2016, defendant, who was then age nineteen, approached the minor, who was then eleven years old.[5] He offered to give her a video game system if she allowed him to touch her and if she would touch his erect penis. The girl declined defendant's proposal. She ran home and reported the incident to her brother.

Several months later in November 2016, defendant (who had turned twenty over the summer) contacted the minor through a social media message. He asked her to send him photographs of her wearing a bikini. She did not respond to him.

On November 14, 2016, the minor and her mother reported the two incidents to the police. Officers from the Special Victims' Unit of the Ocean County Prosecutor's Office interviewed the minor on December 1, 2016. The police also took tape-recorded

---

[4] The record supplied to us does not clearly substantiate whether the minor lives immediately next door to defendant, but it is uncontested that she resides approximately 100 feet from him.

[5] The minor reported that defendant had approached her after she got off a school bus, whereas defendant stated to the police that he had approached her outside of his residence. We need not resolve here this discrepancy about the exact location.

A-2415-16T7

statements from the minor's mother and brother, both of whom provided information consistent with her reported allegations.

Continuing with the investigation, detectives interviewed defendant at a local police station on January 19, 2017.[6] In a video-recorded statement, defendant admitted to the detectives that he had asked the minor for bikini photos. He further admitted that, on another occasion, after watching pornographic videos and obtaining an erection, he opened his front door, saw the minor, and asked her to touch his erect penis.

The police arrested defendant after his interview. In a complaint-warrant, the State charged him with second-degree criminal attempt to sexually assault a child of less than thirteen years of age, N.J.S.A. 2C:5-1(a)(1) and N.J.S.A. 2C:14-2(b), as well as third-degree endangering the welfare of a child by attempting to engage in sexual conduct to impair or debauch that child's morals, N.J.S.A. 2C:24-4(a)(1).

The Pretrial Services Risk Assessment and Recommendation

Using defendant's fingerprints, the police carried out the Act's new automated pretrial risk-assessment process, pursuant to N.J.S.A. 2A:162-25. See N.J. Attorney General Law

---

[6] Defendant does not allege in this interlocutory appeal that his admissions were coerced or that the police failed to warn him of his right to remain silent in compliance with Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

<u>Enforcement Directive No. 2016-6</u> ("<u>Directive No. 2016-6</u>"), at 15-16 (Oct. 11, 2016) (detailing the process).  The automated process gathers information about defendants from various law enforcement and Judiciary databases, including the State Police criminal case history system, the PROMIS/GAVEL criminal database, the MACS municipal court database, and other sources. The information derived from these sources is used to address the following nine risk factors:

> (1) defendant's age at current arrest;
>
> (2) current violent offense, or current violent offense by a defendant twenty years old or younger;
>
> (3) pending charge(s) at the time of arrest;
>
> (4) prior misdemeanor[7] convictions;
>
> (5) prior felony convictions or any prior convictions (misdemeanor or felony);
>
> (6) prior violent convictions;
>
> (7) prior failures to appear in the past two years;
>
> (8) prior failures to appear older than two years; and

---

[7] The risk assessment tool has been developed for the Judiciary by a private foundation. Variations of the tool have been used in other jurisdictions, some of which, unlike New Jersey, use the categorical terms "felony" and "misdemeanor." <u>See</u> Laura & John Arnold Foundation, <u>PSA Risk Factors and Formula</u>, 2 (2012) http://www.arnoldfoundation.org/wp-content/uploads/PSA-Risk-Factors-and-Formula.pdf.

A-2415-16T7

(9) prior sentences leading to incarceration.

Notably, the automated process does not account for a defendant's juvenile history. Hence, the numerical scores it generates do not reflect adjudications of delinquency for serious violent crimes, juvenile violations of probation, or failures of a juvenile to appear at proceedings. Directive No. 2016-6, supra, at 29-30.[8]

Using an algorithm, the automated process generates a Public Safety Assessment ("PSA"), i.e., a risk profile designed to inform the trial court of the likelihood, on a scale of one to six, that defendant, if released before trial, would engage in a New Criminal Activity ("NCA") or Fail to Appear ("FTA") at future court events. Id. at 27. The PSA has also been designed to include a "flag" if there is a statistical likelihood that the defendant would engage in a New Violent Criminal Activity ("NVCA"). Ibid.

A defendant's NCA and FTA scores are then factored into the Judiciary's approved Decision-Making Framework ("DMF"). The DMF

_____

[8] The automated process also does not account for: (1) facts pertaining to the present offense indicating that a defendant is especially dangerous; (2) the strength of the State's case; (3) pending charges or convictions from another state; or (4) a defendant's involvement with a violent street gang or organized crime, drug dependence, or mental illness. See Directive No. 2016-6, supra, at 28-29.

attempts to identify the recommended level and type of conditions and intervention or monitoring services needed to manage the risks posed by defendant if he were released.[9]

At the time of C.W.'s detention hearing, and prior to the Acting Administrative Director's March 2, 2017 clarifying memorandum, the six possible DMF recommendations were: (1) release on own recognizance ("ROR"); (2) release with pretrial monitoring level ("PML") 1; (3) PML 2; (4) PML 3; (5) PML 3 + EM/HD (Electronic Monitoring/Home Detention); or (6) Release Not Recommended. The "Release Not Recommended" category also contained the wording, "If Released, PML3 + EM/HD."[10]

Here, the one-page Pretrial Services report reflected that defendant was twenty years old, and was charged with a violent offense. It further indicated that he had no pending charge at the time of his arrest; no prior indictable or disorderly persons adult convictions; no prior violent adult convictions;

---

[9] Other considerations within the DMF include: (1) the presence or absence of an NVCA flag; (2) whether any of the current offenses were violent; (3) whether defendant was currently charged with escape, murder, sexual assault, robbery, or carjacking; and (4) whether the currently charged offenses exposed defendant to parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2 ("NERA").

[10] According to the March 2, 2017 clarifying memorandum, the DMF and resulting Pretrial Services recommendation will now simply read "No release recommended" for the highest-risk defendants. "Amendment of the Decision Making Framework", supra.

A-2415-16T7

no prior failure to appear pretrial; and no prior sentence leading to incarceration.

Based on this information, defendant was rated by Pretrial Services with a FTA score of one, (i.e., the lowest possible risk for failing to appear), and an NCA score of two, (i.e., the next lowest possible risk for engaging in new criminal activity). Defendant was not "flagged" for new violent criminal activity.

Notwithstanding defendant's low FTA and NCA scores, the recommendation Pretrial Services presented to the trial court was "Release Not Recommended. If Released, Weekly Reporting + HD/EM." The document contained no elaboration on how that recommendation was generated.[11]

---

[11] Instructional slides created by the developers of the PSA tool, which have been supplied to us by amicus American Civil Liberties Union ("the ACLU") counsel without objection, indicate that the DMF process should determine whether a defendant's pending charges involve certain offenses "in which the majority of the time a recommendation of preventative detention would be appropriate regardless of the risk assessment results." Those offenses are escape, murder, aggravated manslaughter, manslaughter, aggravated sexual assault, sexual assault, robbery, or carjacking. The slides also call for a similar recommendation if the PSA resulted in an NVCA flag and one of the current offenses is violent.

Defense counsel and the ACLU argue that these categories, which would include defendant because of the charge of attempted sexual assault, routinely produce an "automatic" and computer-generated Pretrial Services recommendation for detention. We do not have enough information in this record to evaluate whether
(continued)

A-2415-16T7

As the Prosecutor and the Attorney General stress, defendant has a significant prior juvenile record that was not taken into account numerically in his PSA. Specifically, in August 2010, he was adjudicated delinquent for acts that if committed by an adult would constitute second-degree attempted sexual assault and third-degree endangering the welfare of a child, acts which he committed in July 2009. Other charges were dismissed. He was initially ordered to serve three years of probation, and directed to register as a sex offender under Megan's Law. The record does not provide any further details concerning these prior offenses.

Thereafter, defendant was charged with violating probation on two occasions, once in December 2012 and again in February 2013. The record on this appeal does not disclose the nature of those separate violations, which were concurrently adjudicated in the Family Part. However, they apparently were sufficiently serious to cause the court to sentence him in April 2013 to three years of confinement at the New Jersey Training School, an

_____

(continued)
that characterization is correct, and neither the Prosecutor nor the Deputy Attorney General at oral argument knew if it were true. In any event, that particular nuance of the DMF process need not be ascertained or evaluated in this opinion, although counsel are free to develop the record on the subject on remand if they so choose.

all-male juvenile detention center in Jamesburg.  The exact date of his release is not documented in this record.

Defendant's history also reflected that, at some point after he was adjudicated delinquent, he underwent an evaluation for Megan's Law purposes because of the sexual nature of his juvenile offenses.  He was classified as a Tier 3 offender, the highest tier, corresponding to a "great risk of re-offending," as opposed to a low or moderate risk (Tiers 1 and 2).  See Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws 17 (Feb. 2007).[12]

The State's Motion for Pretrial Detention

After defendant was arrested and charged with the present offenses concerning the minor, the State timely moved for his pretrial detention under the new law.  The pretrial detention hearing was held in the Criminal Part on January 25, 2017.

_____

[12] Pursuant to N.J.R.E. 201, we take judicial notice that defendant, represented by an assistant public defender, appealed his tier classification in Docket No. A-4495-15.  The appeal was opposed by an assistant prosecutor.  Neither the assistant public defender nor the assistant prosecutor are counsel involved in the present pretrial detention appeal.  A different panel of this court issued an order on December 9, 2016, affirming in part the trial court's June 21, 2016 tier classification as to certain criteria, but remanding for the reconsideration of other criteria.  Given the sealed nature of that separate classification matter, we do not discuss here its substantive content.

Defendant appeared at the hearing with counsel, and two assistant prosecutors appeared for the State.[13] No witnesses testified.

The Prosecutor asserted at the detention hearing that the State was seeking the detention of defendant because he had been charged with a second-degree offense to which NERA was applicable; was believed to be a Tier 3 Megan's Law registrant[14] who had violated a condition of his release; and otherwise presented a danger to the community. The Prosecutor argued that probable cause had been established, referencing the facts reported to the police as set forth in a supporting affidavit. The Prosecutor further emphasized that, during an interview with police, defendant had admitted to soliciting the minor for bikini photographs through social media and asking her to touch his erect penis.

Defense counsel argued at the hearing that probable cause had not been demonstrated. He contended that a proffer by an affidavit was not sufficient and that the State had to present

---

[13] For ease of discussion, we refer collectively to the two assistant prosecutors as "the Prosecutor."

[14] Neither the Prosecutor nor defense counsel brought to the trial court's attention at the detention hearing that the Tier 3 classification had been appealed and remanded.

live witnesses.[15] He also contended that the State had improperly failed to provide the defense with all discovery in its possession, including the recorded statements made by the minor, witnesses, and defendant.[16]

The trial court was persuaded that the State should have provided the defense with the requested discovery, and stated it was willing to grant an adjournment to allow for that turnover. However, defense counsel declined an adjournment, as he did not want to delay matters and have defendant remain in jail for that reason. Accordingly, the court ruled that probable cause had been preliminarily established for purposes of the detention hearing, but indicated it would consider defendant's assertions of alleged deficiencies in the State's presentation in its final decision.

Following the court's probable cause ruling, the Prosecutor announced that the State was relying on defendant's PSA and criminal case history in support of its motion for detention.

---

[15] This categorical legal argument was subsequently rejected in Ingram, supra, ___ N.J. Super. ___ (slip op. at 34).

[16] The following month in Robinson, supra, ___ N.J. Super. ___ (slip op. at 27), we clarified the State's discovery obligations in relation to the detention hearing. The Supreme Court has granted the State's motion for leave to appeal in Robinson, and the case is awaiting argument before the Court.

She urged that defendant should not be released under any circumstances.

Although the Prosecutor recognized that defendant had low scores on the PSA, she asserted "this [was] one of the occasions where the PSA simply [did] not account for the defendant's [offense] history and/or the serious nature of the crime." She noted that while defendant has not had the opportunity to amass an adult criminal record, he does have a significant juvenile record. In fact, she asserted he committed as a youth sexual wrongdoing allegedly similar to the current charges. She also emphasized defendant's probationary sentence, his previous designation as a Tier 3 Megan's Law offender, his subsequent violations of probation, and his ultimate commitment to three years in juvenile detention. Based upon his history, the Prosecutor maintained that there was a high risk that defendant would not comply with release conditions and would, once again, re-offend.

Defense counsel responded that the PSA, on which defendant had received very low scores, was a reliable "sanitized assessment" of his actual history. Counsel acknowledged, as an aside and without any further comment, that defendant did have "one juvenile conviction [sic]" that was not accounted for by the PSA scores.

Defense counsel further argued that his client not only must be presumed innocent, but also should be given the opportunity under the new Act to show the court that he could comply with release conditions while his charges were pending. Counsel maintained that defendant was not a flight risk because he had been residing with his parents "for many years now" in Ocean County, had a girlfriend who was three months pregnant, and was about to start a job at a local restaurant.

With respect to conditions of release, defense counsel asserted that defendant was willing to stay away from the minor, her residence, and school, and also would remain in contact with counsel and Pretrial Services. He represented that defendant was presently on medication, receiving counseling, and being monitored by his parole officer.

### The Trial Court's Rulings

After considering these arguments and the written materials, the trial court issued an oral ruling at the end of the hearing, denying the State's motion for detention and instead releasing defendant on several conditions.

Among other things, the court observed in its oral decision that defendant has "roots in the community," "prospects of employment," and "ties . . . to [the] area." The court further noted that defendant had "no failure to appear in the past two

years," and "no prior sentence" for an adult crime. The court also recognized that defendant is "presumed innocent until proven guilty," and that he had not been charged with murder or another offense that would make him presumptively inappropriate for release under the new statutory scheme.

The trial court did briefly acknowledge that defendant had a prior juvenile delinquency adjudication for second-degree sexual assault, had been classified under a Tier 3 pursuant to Megan's Law, and had apparently "re-offended quickly after he was released." Nevertheless, the court concluded that the State had not met its burden by clear and convincing evidence under the statute to show that no combination of conditions could reasonably assure defendant's appearance in court and the protection and safety of the community before trial.

The court denied the State's immediate motion for a stay for purposes of an emergent appeal. The court then agreed, without defense objection, to impose all of the conditions the Prosecutor had requested if release were granted. These conditions required defendant to: (1) avoid all contact with the minor and her family; (2) appear for all scheduled court proceedings; (3) immediately notify Pretrial Services of any change of address, telephone number, or other contact information; (4) avoid the commission of any new offenses; (5)

report to Pretrial Services telephonically once every other week, and in person once every other week; (6) remain on home detention, with electronic monitoring; and (7) comply with his Megan's Law obligations.

Defendant agreed to abide by these conditions, but inquired if he was still allowed to go to work. Without waiving its right to pursue the present appeal, the Prosecutor did not object to defendant working, provided that he adhere to a strict schedule and return home after work immediately. It was also agreed that defendant had to stay at least 500 feet away from the minor's home.

After dismissing the parties, the court reconvened the proceeding later that same day, upon learning that the minor actually lived within 100 feet of defendant's home, and also that defendant would likely come into contact with minors if he were to work at the local restaurant. Given this additional information, the court modified its original ruling. It determined that, because defendant and the child apparently were neighbors, he would have to remain inside his home at all times, except to go to work or to appointments with the advance permission of Pretrial Services. The court further directed that defendant would have to find employment at a different

location where he would not be likely to come into contact with minors.

The court issued an order implementing those terms that same afternoon. The order did not elaborate further on the court's reasons, but instead cross-referenced the bench ruling. Hours later, the State filed an application with this court for permission to file an emergent motion for leave to appeal. We denied the emergent motion, without prejudice to the State's right to file a motion for relief in the regular course. The Supreme Court likewise denied emergent relief.

The State promptly moved for leave to appeal on January 31, 2017. The same day, we issued a sua sponte interim order, directing the trial court to furnish, as mandated by N.J.S.A. 2A:162-23(a)(2), a written statement of reasons for denying detention contrary to the Pretrial Services recommendation.

The trial court submitted the written statement of reasons on February 2, 2017. In that amplification, the trial court first noted the parties' discovery dispute and the alleged deficiencies in the State's probable cause presentation. It then summarized the parties' arguments in support of and against pretrial detention. The court repeated its conclusion that, after considering all of the arguments and proofs, the State had not established its burden to justify detention by clear and

convincing evidence. The statement of reasons did not refer to the Pretrial Services recommendation, but it did again reference defendant's low PSA scores.

We then granted the State's motion for leave to appeal. Meanwhile, at our invitation, the Attorney General and the ACLU each moved for and were granted leave to appear as amicus curiae.

On appeal, the Prosecutor and the Attorney General urge that we reverse the trial court's denial of the State's detention motion. They argue that the trial court abused its discretion by overlooking or under-valuing important aspects of this case, including, among other things, defendant's juvenile history as a sex offender, his violations of probation, his tier classification under Megan's Law, his very close proximity to the minor's residence, and the Pretrial Services recommendation to detain.

Defendant and amicus ACLU argue that the trial court's decision was reasonable, supported by the record, and consistent with the terms and objectives of the new law, and should not be disturbed.

## II.

Before delving into the legal issues raised by this appeal, we begin with a brief overview of the key elements of the Act

and the associated Rule 3:4A, the latter which was approved in August 2016 and became effective with the new statute on January 1, 2017.

The Act signals a momentous change in our State's criminal justice system. As our colleagues extensively detailed in Robinson, supra, ___ N.J. Super. ___ (slip op. at 8-10), the Act is the result of a constitutional mandate by New Jersey voters to replace the former bail-dependent system with a system providing defendants with "a right to pretrial release, but authorizing pretrial detention under certain limited circumstances." See N.J. Const. art. I, ¶ 11. The Act also imposes certain speedy trial requirements. See N.J.S.A. 2A:162-22.

"As codified by the Bail Reform Act, the new system favors pretrial release and monitoring as the presumptive approach and limits preventive detention to defendants who actually warrant it." Robinson, supra, ___ N.J. Super. ___ (slip op. at 8). "By permitting judges to keep high-risk defendants detained without bail, and to release with or without conditions those defendants who pose little risk of flight or of committing another offense, these constitutional and legislative changes represent a major reform to criminal justice that will promote public safety and fairness." Ibid.

Nonetheless, the trial court remains authorized, upon motion of a prosecutor, to order pretrial detention of a particular defendant when it finds by "clear and convincing evidence, that no condition or combination of conditions can reasonably assure the effectuation of these goals."  N.J.S.A. 2A:162-15; accord N.J.S.A. 2A:162-18(a)(1); N.J.S.A. 2A:162-19(e)(3).

The State may file an application for pretrial detention when a defendant is charged with, among other things:  (1) any crime of the first or second degree enumerated under NERA[17]; or (2) any crime enumerated under N.J.S.A. 2C:7-2(b)(2) (Megan's Law) or the crime of endangering the welfare of a child under N.J.S.A. 2C:24-4.  See N.J.S.A. 2A:162-19(a)(1) and (4).  Under this same statutory section, the State may also move for pretrial detention when a defendant is charged with any other crime for which the prosecutor believes there is a serious risk that the goals set forth in N.J.S.A. 2A:162-15 cannot be met. N.J.S.A. 2A:162-19(a)(7).

At the detention hearing required by N.J.S.A. 2A:162-19(c), if the defendant has not yet been indicted, "the prosecutor shall [first] establish probable cause that the eligible

---

[17] It is undisputed that defendant, who is charged with a second-degree offense, meets this predicate requirement.

defendant committed the predicate offense." N.J.S.A. 2A:162-19(e)(2). Probable cause consists of a "well grounded" suspicion that an offense has been committed. State v. Sullivan, 169 N.J. 204, 211 (2001). See also Ingram, supra, ___ N.J. Super. ____ (slip op. at 8-9).

Except for when an eligible defendant is charged with a crime set forth in N.J.S.A. 2A:162-19(b), i.e., murder or any crime for which the defendant would be subject to an ordinary or extended term of life imprisonment, the statute imposes a rebuttable presumption against detention. N.J.S.A. 2A:162-18(b).[18] Hence, in order to prevail on a detention motion in other offense categories, the State must rebut the presumption that some amount of monetary bail, non-monetary conditions, or a combination thereof would reasonably assure (1) the defendant's appearance in court when required, (2) the protection of the safety of any other person or the community, and (3) that the defendant will not obstruct or attempt to obstruct the criminal justice process. N.J.S.A. 2A:162-18(b).

---

[18] In these other instances, there is a rebuttable presumption that the eligible defendant "shall be detained." N.J.S.A. 2A:162-19(b) (emphasis added). The defendant can rebut this presumption by the lesser proof standard of preponderance of the evidence. N.J.S.A. 2A:162-19(e)(2). Under this same statutory provision, if the defendant successfully rebuts the presumption, the prosecutor can still establish grounds for detention by clear and convincing evidence. Ibid.

The Act further prescribes that the court at a detention hearing "may take into account" the following information:

> a. The nature and circumstances of the offense charged;
>
> b. The weight of the evidence against the [presumptively] eligible defendant, except that the court may consider the admissibility of any evidence sought to be excluded;
>
> c. The history and characteristics of the eligible defendant, including:
>
> (1) the eligible defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (2) whether, at the time of the current offense or arrest, the eligible defendant was on probation, parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal law, or the law of this or any other state;
>
> d. The nature and seriousness of the danger to any other person or the community that would be posed by the eligible defendant's release, if applicable;
>
> e. The nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process that would be posed by the eligible defendant's release, if applicable; and
>
> f. The release recommendation of the pretrial services program obtained using a

risk assessment instrument under <u>N.J.S.A.</u> 2A:162-25.

[<u>N.J.S.A.</u> 2A:162-20.]

Notably, although Section 20 of the Act does not place any special emphasis on the PSA, another provision within the Act, <u>N.J.S.A.</u> 2A:162-16(b)(1), expressly mandates the court "<u>shall</u> consider the [Pretrial Services] risk assessment and recommendations on conditions of release before making any pretrial release decision[.]" (Emphasis added).

We agree with the State that this quoted language within Section 16 signifies that a trial court may not ignore the Pretrial Services recommendation in its detention analysis, although it is not bound to follow it. That interpretation is consistent with Section 23(a)'s requirement that, if the court issues an order contrary to the recommendations of Pretrial Services, the judge "shall provide an explanation in the document that authorizes the eligible defendant's release." <u>N.J.S.A.</u> 2A:162-23(a)(2) (emphasis added). As we discuss, <u>infra</u>, that did not occur here, perhaps due to perceived ambiguities in the two-part format of the recommendation.

New <u>Rule</u> 3:4A(b)(5), which implements these statutory facets, instructs that the court:

> <u>may consider as prima facie evidence</u>
> <u>sufficient to overcome the presumption of</u>
> <u>release a recommendation by [Pretrial</u>

Services] established pursuant to <u>N.J.S.A.</u> 2A:162-25 <u>that the defendant's release is not recommended</u> (i.e., a determination that "release not recommended or if released, maximum conditions").     Although such recommendation by [Pretrial Services] <u>may constitute sufficient evidence upon which the court may order pretrial detention</u>, nothing herein shall preclude the court from considering other relevant information [in reaching its detention determination].

[(Emphasis added).]

"After considering all the circumstances, the [Pretrial Services] risk assessment and recommendations on conditions of release, and any information that may be provided by a prosecutor or the eligible defendant, the court shall order that the eligible defendant" be either detained or released. <u>N.J.S.A.</u> 2A:162-16(b)(2).   A defendant may be released on:  (1) his or her own recognizance; (2) execution of an unsecured appearance bond; (3) non-monetary conditions; (4) monetary bail; or (5) a combination of conditions and monetary bail.   <u>N.J.S.A.</u> 2A:162-16(b)(2); <u>N.J.S.A.</u> 2A:162-17.   Monetary bail can only be used to reasonably assure the eligible defendant's appearance. <u>N.J.S.A.</u> 2A:162-17(c)(1).[19]

---

[19] The court-ordered non-monetary conditions, paraphrased, may require the defendant to:  (1) refrain from committing any offense during the period of release; (2) avoid all contact with an alleged victim of the crime; (3) avoid all contact with all witnesses who may testify concerning the offense; (4) remain in the custody of a designated person, who agrees to assume
(continued)

With this backdrop in mind, we turn to the discrete issues presented.

A.

Our first task is to ascertain the appropriate scope of appellate review of a trial court's order granting or denying pretrial detention. The Act does not specify a scope of review. Nor have our two published cases resolved it while examining other important legal issues under the new law. But see Ingram, supra, ___ N.J. Super. ___ (slip op. at 37-38) (noting that the Attorney General had posited an abuse-of-discretion review

---

(continued)
supervision and to report any violation of a release condition to the court; (5) maintain employment, or, if unemployed, actively seek employment; (6) maintain or begin an educational program; (7) abide by specified restrictions on personal associations, place of residence, or travel; (8) report on a regular basis to a designated law enforcement agency, or other agency, or pretrial services program; (9) comply with a specified curfew; (10) refrain from possessing a firearm, destructive device, or other dangerous weapon; (11) refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance without a prescription by a licensed medical practitioner; (12) undergo all available medical, psychological, or psychiatric treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose; (13) return to custody for specified hours following release for employment, schooling, or other limited purposes; (14) be placed in a pretrial home supervision capacity with or without the use of an approved electronic monitoring device; or (15) satisfy any other condition deemed necessary to reasonably assure the effectuation of the goals of the Act. N.J.S.A. 2A:162-17(b)(1) and (2).

standard, and that the Public Defender had indicated at oral argument that such a standard "most likely" applied).

Our task has been eased because the parties and the amici essentially agree that the appropriate general standard of appellate review is to sustain the trial court's decision unless it represents an abuse of discretion. However, as the parties also agree, de novo review must be conducted if the trial court erred in its application of the law, such as by relying on a legally impermissible reason, by failing to consider a legally required factor in the detention calculus, or by failing to provide adequate reasons for its decision.

Even though we accept counsel's agreement that these are the appropriate review standards for appeals arising under the Act, we provide the following discussion for sake of completeness. We begin with a recognition that the statute explicitly confers upon defendants a right to appeal an order of pretrial detention "pursuant to the Rules of Court." N.J.S.A. 2A:162-18(c).[20] The appeal "shall be heard in an expedited manner." Ibid. In addition, the defendant who was denied release by the trial court "shall be detained pending the disposition of the appeal." Ibid.

---

[20] See R. 2:9-13 (eff. Jan. 1, 2017) (delineating new rules of appellate practice specifically to guide detention appeals).

Although the State has no reciprocal statutory right to appeal decisions granting a defendant's pretrial release, it can pursue interlocutory review in this court's discretion. The State may do so through a motion for leave to appeal filed in accordance with the general requirements of Rules 2:2-3 and 2:5-6. Indeed, that is the jurisdictional path that led to the present case being heard by this court, having granted leave to appeal.

None of the parties or amici support adopting the standards of review that case law from the circuit courts has deemed applicable under the federal Bail Reform Act, 18 U.S.C.A. §§ 3141 to 3156 (1984), on which the Act was largely based. Like our own law, the federal statute does not identify the applicable standard of review. United States v. Perry, 788 F.2d 100, 104 (3d Cir.), cert. denied, 479 U.S. 864, 107 S. Ct. 218, 93 L. Ed. 2d 146 (1986). The circuit courts have been split in resolving that question.

Three circuit courts have adopted a "clearly erroneous" standard, i.e., a highly deferential standard much like a traditional abuse of discretion standard, whereby the detention order will be sustained if it is supported by the evidence presented at the hearing. See, e.g., United States v. English, 629 F.3d 311, 319 (2d Cir. 2011); United States v. Rueben, 974

F.2d 580, 586 (5th Cir. 1992), cert. denied, 507 U.S. 940, 113 S. Ct. 1336, 122 L. Ed. 2d 720 (1993); United States v. Fortna, 769 F.2d 243, 250 (5th Cir. 1985); United States v. Chimurenga, 760 F.2d 400, 405-06 (2d Cir. 1985); United States v. Williams, 753 F.2d 329, 333 (4th Cir. 1985).

A majority of the circuit courts, however, independently review detention decisions affording more limited deference to the district court's ruling. United States v. O'Brien, 895 F.2d 810, 813 (1st Cir. 1990). Under this more stringent standard, "[i]f upon careful review of all the facts and the trial judge's reasons the appeals court concludes that a different result should have been reached, the detention decision may be amended or reversed." Id. at 814.

Meanwhile, six circuit courts adhering to the "independent" standard of review specify that factual findings will only be reversed if they are clearly erroneous. United States v. Cisneros, 328 F.3d 610, 613 (10th Cir. 2003); United States v. Portes, 786 F.2d 758, 762 (7th Cir. 1985); United States v. Hurtado, 779 F.2d 1467, 1470-72 (11th Cir. 1985); United States v. Maull, 773 F.2d 1479, 1487 (8th Cir. 1985); United State v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985); United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985).

Two other circuits generally hold that the district court's determination should simply be given deference. United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003); O'Brien, supra, 895 F.2d at 814; United States v. Delker, 757 F.2d 1390, 1399-1400 (3d Cir. 1985). However, as explained in O'Brien, supra, 895 F.2d at 813, as a practical matter, this general deference "to the determination of the trial court in the context of an independent review typically will mean giving the greatest deference to purely factual determinations."

The parties and amici in this case eschew these varying federal approaches. They instead urge that we apply traditional standards of review that have been used in appeals of bail decisions in our State.

Historically, the purpose of bail was not to protect the community from a defendant's future criminal or antisocial conduct or to inflict punishment, but instead merely to ensure the defendant's appearance at court proceedings. State v. Korecky, 169 N.J. 364, 376 (2001); State v. Steele, 430 N.J. Super. 24, 35-37 (App. Div. 2013), certif. improvidently granted, 223 N.J. 284 (2014). The setting of bail has been entrusted to the reasonable and sound discretion of the trial court, and our appellate courts have generally sustained those rulings in the absence of a proven abuse of discretion. See,

e.g., State v. Fajardo-Santos, 199 N.J. 520, 533-34 (2009); Korecky, supra, 169 N.J. at 373; Steele, supra, 430 N.J. Super. at 34-35. The trial court's discretionary decision to impose non-monetary conditions of release upon a defendant to protect the public also has been customarily reviewed for an abuse of that discretion. See, e.g., State v. Johnson, 61 N.J. 351, 364 (1972); Steele, supra, 430 N.J. Super. at 34.

While the concept is difficult to define with precision, an appellate court "may find an abuse of discretion when a decision 'rest[s] on an impermissible basis' or was 'based upon a consideration of irrelevant or inappropriate factors.'" Steele, supra, 430 N.J. Super. at 34-35 (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)). An appellate court can also discern an abuse of discretion when the trial court fails to take into consideration all relevant factors and when its decision reflects a clear error in judgment. State v. Baynes, 148 N.J. 434, 444 (1997). Likewise, when the trial court renders a decision based upon a misconception of the law, that decision is not entitled to any particular deference and consequently will be reviewed de novo. See, e.g., State v. Stein, 225 N.J. 582, 593 (2016); State v. Williams, 441 N.J. Super. 266, 272 (App. Div. 2015).

A reviewing court generally will give no deference to a trial court decision that fails to "provide factual underpinnings and legal bases supporting [its] exercise of judicial discretion." Clark v. Clark, 429 N.J. Super. 61, 72 (App. Div. 2012). If a trial court has merely catalogued the evidence and issued an order without sufficiently explaining its reasoning, such a conclusory approach does not serve the parties and does not facilitate appellate review. It is vital that the trial court make the necessary findings and explain its reasons. See generally, R. 1:7-4; see also Barr v. Barr, 418 N.J. Super. 18, 46 (App. Div. 2011); Barnett & Herenchak, Inc. v. State, 276 N.J. Super. 465, 472 (App. Div. 1994); In re Valley Hosp., 240 N.J. Super. 301, 306 (App. Div. 1990), certif. denied, 126 N.J. 318 (1991).

We concur with counsel that these well-established general principles of appellate review are sensibly applied in the context of pretrial detention rulings issued under the Act. The statutory scheme envisions that judges in the Criminal Part repeatedly will be called upon to make detention decisions in a wide array of cases. Over time, those trial judges will naturally develop considerable expertise in applying the terms of the Act. As the First Circuit observed in O'Brien, supra, 895 F.2d at 813, "it would unduly intrude on the ability of

35

[trial] courts to render these [pretrial detention] decisions on a day to day basis if they were subjected to cavalier treatment by an appellate court with little experience or opportunity to develop expertise."

The wording of the Act itself lends support to the adoption of an abuse of discretion review standard. Section 18 states that the court "may" order release if the State has met its burden. N.J.S.A. 2A:162-18(a). Furthermore, Section 20 outlines the factors that the trial court "may" consider in ruling on detention motions. N.J.S.A. 2A:162-20. "The use of the word 'may' generally conveys that an action is permissive, not mandatory." Myers v. Ocean City Zoning Bd., 439 N.J. Super. 96, 101 (App. Div. 2015) (citing Harvey v. Bd. of Chosen Freeholders of Essex Cty., 30 N.J. 381, 391 (1959) (stating that, absent legislative intent to the contrary, use of "may" indicates that a provision is permissive, and use of "shall" or "must" reflects that a provision is mandatory)).

From a policy perspective, the objectives of the new Act in attaining the expeditious resolution of criminal cases could be thwarted if this court routinely second-guessed decisions on pretrial detention motions simply because we personally would have reached a different result than the trial judge. We surely do not wish to encourage dissatisfied parties to file appeals

having little or no merit on such collateral issues, while the trial court proceedings are possibly stalled in the meantime and the parties' resources are diverted to appellate briefing. Excessive appeals are also bound to interfere with the Act's speedy trial goals.

That said, we also must remain vigilant that detention rulings are not simply rubber-stamped, and that the procedural and substantive requirements of the Act and other legal principles are honored. In many instances, the pretrial hearing may entail no witness testimony and no need for credibility findings by the trial court, to which we ordinarily accord great deference. State v. Locurto, 157 N.J. 463, 471 (1999). Hence, we often will be looking at precisely the same paper record concerning a defendant's risks as the trial court. Even so, our primary role in appellate correction should be one of assuring that the law is being followed properly in the trial court. The traditional standards of review used by our courts in bail cases will serve that goal.

When conducting appellate review under this largely deferential standard, we also must bear in mind the evidentiary standard under the Act that governs the detention ruling. Where, as here, the charged offenses do not trigger a presumption of detention pursuant to N.J.S.A. 2A:162-19(b) — as

it would in murder and life imprisonment cases — the State must meet a heavy burden to establish the need for detention by "clear and convincing evidence." N.J.S.A. 2A:162-18(a)(1). The drafters of the Act presumably chose that high bar to make detention the appropriate result for only a limited group of the most serious cases, where public safety is demonstrably threatened by a defendant's release, the defendant clearly is not likely to appear for court, or he or she is likely to threaten to obstruct the criminal justice process.

The State's burden of establishing clear and convincing evidence in this context falls somewhere between the ordinary civil standard of preponderance of the evidence and the criminal standard of beyond a reasonable doubt. In re Perskie, 207 N.J. 275, 289 (2011). This heightened standard is typically applied where the evidentiary matters are complex, prone to abuse, error or injustice, and also where an individual's interests in liberty or personal welfare are at stake. Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 170 (2006); State v. Michaels, 136 N.J. 299, 321-23 (1994). The standard is also frequently imposed where, by operation of common or statutory law, a strong presumption favors a contrary result. See Auge v. N.J. Dept. of Corr., 327 N.J. Super. 256, 263 (App. Div.), certif. denied, 164 N.J. 559 (2000).

Clear and convincing evidence should produce in the mind of the decision-maker "a firm belief or conviction as to the truth of the allegations sought to be established." State v. Hernandez, 170 N.J. 106, 127 (2001) (quoting In re Samay, 166 N.J. 25, 30 (2001)); State v. Hodge, 95 N.J. 369, 376 (1984). The evidence must be "so clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the precise facts in issue." In re Seaman, 133 N.J. 67, 74 (1993) (quoting Aiello v. Knoll Gold Club, 64 N.J. Super. 156, 162 (App. Div. 1960)); accord Hernandez, supra, 170 N.J. at 127. To meet this test, the truth of an allegation must be "highly probable." Perskie, supra, 207 N.J. at 290.

Consequently, in exercising our role of appellate oversight, we are obligated to bear in mind the challenging burden under the Act that the State must meet in most cases to support its detention motion. If the points in favor of the detention motion do not heavily weigh in favor of the State in such instances, the trial court should deny the application, and we should be loath to disturb that denial on appeal. Conversely, if the State manifestly has made such a showing, we must carefully consider whether the trial court has abused its

discretion or misapplied the law in rejecting the application and, if so, set aside the determination.

B.

We next consider the legal significance of a defendant's prior juvenile record in making a detention decision under the Act. This likewise is an issue on which counsel fundamentally agree.

As we have noted, the Pretrial Services matrix for the NCA and FTA scores does not statistically incorporate a defendant's prior juvenile record. Nevertheless, Section 20 of the Act broadly authorizes the trial court to consider a defendant's "past conduct" as one of the many permissible factors in evaluating his or her suitability for pretrial release. N.J.S.A. 2A:162-20(c)(1).

A defendant's prior adjudications of delinquency and the nature of his or her juvenile offenses are logically part of his or her "history and characteristics" and indicative of the danger he or she poses to the community under N.J.S.A. 2A:162-20(c) and (d). Notably, juvenile history is taken into account in federal detention determinations, where the court is directed, under 18 U.S.C.A. § 3142(g), to consider the same types of information set forth in N.J.S.A. 2A:162-20. See,

40

e.g., United States v. Begay, 315 Fed. Appx. 53, 54-56 (10th Cir. 2009).

We appreciate that the objectives of the juvenile justice system generally differ from those for the adult criminal justice process. See, e.g., In re Registrant J.G., 169 N.J. 304, 325 (2001) (emphasizing the Juvenile Code's preference for "supervision, care and rehabilitation" as alternatives, instead of incarceration for juveniles adjudicated delinquent); State ex rel. S.S., 367 N.J. Super. 400, 407 (App. Div. 2004), aff'd 183 N.J. 20 (2005) ("Even with respect to a juvenile charged with conduct that would be a crime if committed by an adult, the overriding goal of the juvenile justice system is rehabilitation, not punishment.").

Nevertheless, an adult defendant's prior juvenile record may properly be considered in making sentencing determinations, particularly if the juvenile adjudications are relatively recent, voluminous, or severe. See, e.g., State v. Torres, 313 N.J. Super. 129, 162 (App. Div.) (instructing that a sentencing court may consider defendant's juvenile record, even if the charges did not result in adjudications), certif. denied, 156 N.J. 425 (1998); State v. Phillips, 176 N.J. Super. 495, 502 (App. Div. 1980) (holding that a sentencing judge may consider juvenile offenses "so long as they are not given the weight of a

criminal conviction") (citing State v. Marzlof, 79 N.J. 167, 176-77 (1979)).

Simply stated, a defendant's juvenile offenses may count in the detention calculus, but should not be weighed as heavily as prior adult convictions. None of the parties before us dispute this principle.

C.

We next consider the relevance of a defendant's prior tier classification as a sex offender under Megan's Law. As part of the Megan's Law assessment for such potential registrants, the State is obligated to demonstrate the propriety of defendant's tier classification by clear and convincing evidence. In re Registrant M.F., 169 N.J. 45, 54 (2001).

The RRAS was developed by a committee of mental health experts and members of the law enforcement community convened by the Attorney General. See In re Registrant of C.A., 146 N.J. 71, 82 (1996); In re Registrant V.L., 441 N.J. Super. 425, 428-32 (App. Div. 2015). The RRAS was created in response to the Legislature's directive in Megan's Law for the Attorney General to promulgate guidelines and procedures for notification of a sex offender's whereabouts, depending upon the offender's degree of risk of re-offense. N.J.S.A. 2C:7-8; V.L., supra, 441 N.J. Super. at 428-29. The RRAS is divided into four categories

corresponding to the individual's seriousness of offense, offense history, personal characteristics, and community support. Id. at 429. Each category contains at least two of a total of thirteen criteria, and each such criterion is assigned a score corresponding to a low, moderate, or high risk assessment. Ibid. The factors are then all assigned weights with a multiplier, producing an overall score that numerically classifies the offender in either Tier 1 (low risk of re-offense), Tier 2 (moderate risk of re-offense), or Tier 3 (high risk of re-offense). Ibid. The scoring is to be conducted in accordance with Guidelines issued by the Attorney General, id. at 426, and a Registrant Risk Assessment Manual, id. at 429.

Placement in Tier 3 under Megan's Law means that a defendant has been found by clear and convincing evidence to be in "the highest risk [of re-offense] category for sexual offenders[,] requiring Internet registration and the most comprehensive degree of community notification." Riley v. N.J. State Parole Bd., 219 N.J. 270, 276 (2014); M.F., supra, 169 N.J. at 52-54.

Here, when defendant was designated as a Tier 3 Megan's Law offender, he presumably underwent a comprehensive evaluation in

order to determine the likelihood that he would re-offend.[21] The precise nature of his original offenses would have been considered. Many aspects of his life and character would have been assessed. Another trial judge conducted a hearing on that classification, at which defendant presumably had the right to counsel.

It is obvious that an assessment conducted pursuant to Megan's Law tier review comprises a material, although not dispositive, source of information for a trial court when conducting a detention hearing. The tier classification logically falls within the broad ambit of N.J.S.A. 2A:162-20(c)(1), which authorizes the pretrial detention judge to consider a defendant's "character," "physical and mental condition," "past conduct," and other personal history and characteristics.

In fact, many of the risk-related considerations within the Megan's Law assessment topically correspond to those at issue under the Act, in gauging a defendant's likelihood of re-offending while on release. The Megan's Law tier classification should be particularly instructive where, as here, the defendant is charged with new sexual offenses.

---

[21] As we have noted, we do not know the current status of defendant's tier classification in the wake of the December 2016 remand.

## D.

The final legal issue before us is whether, as the Prosecutor argued in his initial brief, a Pretrial Services recommendation to detain a defendant creates, under Rule 3:4A(b)(5), a rebuttable presumption against release that a defendant must overcome. At oral argument on the appeal, the Prosecutor withdrew this particular argument.

To aid the trial bench and bar, we should nevertheless point out that, as the Rule expressly states, a Pretrial Services recommendation to detain a defendant may be, but is not required to be, relied upon by the court as "prima facie evidence" to support detention. R. 3:4A(b)(5). Again, the use of the term "may" within the provision signals discretion. Harvey, supra, 30 N.J. at 391. The court may require a prosecutor to rely upon more than the PSA and the recommendation to carry its burden. Cf. Ingram, ___ N.J. Super. ___ (slip op. at 33) (analogously noting the court's discretion to require a prosecutor to provide a more expansive proffer to establish probable cause).

## III.

Having addressed these various general points of law implicated by the new Act, we finally turn to the trial court's rulings in this case. We approach our review acutely cognizant

45

that the court's rulings were issued in the first month of the new Act's implementation. That was before any published case law construing the Act had emerged and while prosecutors, defense lawyers, and court personnel were all adjusting to the many operational challenges presented by the new statute. Indeed, much of the trial court's oral and written analysis focused on discovery and proffer issues that had yet to be addressed in a published opinion, until this court's respective February 2017 decisions in Robinson and Ingram.

With that context and timing in mind, and affording all due deference to the trial court's zone of discretion, we have several reservations about the court's reasoning, as well as the sufficiency of the record.

Despite the temporary remand, the trial court did not explain in writing specifically why it deviated from the portion of the Pretrial Services recommendation advising against defendant's release. As we have already noted, such a written explanation is required by the Act in N.J.S.A. 2A:162-23(a)(2). We suspect that this critical omission may have been caused by the somewhat confusing two-part format of the PSA, which the Judiciary has now corrected prospectively since March 2. It is conceivable that the trial court may have perceived that the second part of the Pretrial Services recommendation stating, "If

released, weekly reporting + HD/EM," meant that detention and release on conditions were equally recommended for C.W. As the Acting Administrative Director's March 2 memo clarified, such equivalency was not intended under the prior format.

We recognize the public defender and the ACLU have argued that a Pretrial Services recommendation to detain is automatic, or at least virtually automatic, for any defendant charged with a sexual assault. Even if the recommendation to detain in such cases is, in fact, an automatic, computer-generated certainty in sexual assault cases, the statute nevertheless obligates the trial court to provide written reasons explaining why it is departing from that recommendation, whatever its genesis. That unfortunately was not done here.

The trial court did mention in its rulings the two low scores in defendant's PSA for FTA and NCA, and the absence of a violence flag. We cannot tell, however, how much weight the court actually placed on those low numbers. The numbers are not particularly informative here since they do not reflect defendant's juvenile history, and since he would presumably not have skipped a court appearance while he was confined for several years at Jamesburg.

We are also concerned about the trial court's abbreviated passing references to defendant's juvenile record and his

classification under Megan's Law. The court did mention the existence of those things in its oral ruling, but did not explain why they did not make a difference to the outcome.

The present record on these points is also deficient to afford meaningful consideration. We do not know what conduct was involved in defendant's two violations of probation in 2012 and 2013. Apparently, he was not charged with additional substantive offenses stemming from those incidents, but that does not necessarily mean that they were minor or did not correlate in some way to defendant's past wrongful behavior. Similarly, there is no information in this record about the timing, details, underlying rationale, or current status of the tier classification under Megan's Law.

As an additional concern, we lack confidence that in denying detention the trial court sufficiently took into account several points stressed by the State, including defendant's alleged commission of a new sexual offense after his discharge from Jamesburg, the close proximity of the minor's residence (which only seemed to come into play in phase two of the January 25 hearing with respect to modifying the conditions of release), and overall public safety considerations.

The Prosecutor and the Attorney General urge that we reverse the trial court's ruling and issue our own order

48

mandating detention. Conversely, defense counsel and the ACLU submit that we affirm the trial court's ruling as is, although they candidly acknowledge certain shortcomings in the record and the court's analysis. They also maintain that the statute only permits the State or a defendant to reopen a detention hearing with material information that was "not known" to that party at the time of the original hearing. N.J.S.A. 2A:162-19(f).

We adopt neither advocated course of action. Instead, we remand the matter for reconsideration by the trial court, which will now have the benefit of the new case law, as well as the March 2, 2017 guidance memorandum and this opinion. The parties and the court shall develop or clarify the record further, as may be feasible and fair under the circumstances.

In issuing this remand, we do not encourage prosecutors in the future to make "bare-bones" presentations at detention hearings with an expectation that they will automatically receive a second chance at amplifying their contentions if they do not prevail. Nor do we invite defense counsel or trial judges, despite the busy and rapid-paced nature of this docket, to cut corners unduly. Nevertheless, as our system adapts to the new law, a remand in this case is a fair and instructive outcome.

In the meantime, the stringent conditions of defendant's release set forth in the trial court's January 25, 2017 order shall remain in place, unless and until the trial court issues a superseding order. The aggrieved party on the outcome of reconsideration may seek review in a new appeal or motion for leave to appeal. We do not retain jurisdiction.

Remanded for further consideration by the trial court, consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION