**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5376-16T1

IN THE MATTER OF REGISTRANT B.B.

_____

Argued June 26, 2018 — Decided July 25, 2018

Before Judges Simonelli and Koblitz.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Docket No. ML-99-
07-0140.

James H. Maynard argued the cause for
appellant B.B. (Maynard Law Office, LLC,
attorneys; James H. Maynard, on the briefs).

Frank J. Ducoat, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued
the cause for respondent State of New Jersey
(Robert D. Laurino, Acting Essex County
Prosecutor, attorney; Frank J. Ducoat, of
counsel and on the brief).

PER CURIAM

Appellant B.B. appeals from the denial of his motion to

terminate his community supervision for life (CSL) imposed after

he pled guilty on December 17, 1996 to two counts of second-degree

sexual assault, N.J.S.A. 2C:14-2(c), and third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a).  We reverse.

The charges against B.B. stemmed from his sexual assault of his two eight-year-old half-sisters and his attempt to engage in sexual contact with his eleven-year-old female neighbor.  B.B. was seventeen years old when he committed these offenses.  A psychologist examined B.B. at the Adult Diagnostic and Treatment Center (ADTC), and concluded he met "the statutory criteria for compulsive and repetitive deviant sexual behavior[,]" and was "clearly eligible for sentencing under the purview of the New Jersey Sex Offender Act."

On May 16, 1997, the trial court imposed concurrent five-year terms of imprisonment on the sexual assault counts, and a concurrent four-year term on the endangering the welfare of a child count, to be served at the ADTC.  The court also required B.B. to register under Megan's Law, N.J.S.A. 2C:7-2(g), and imposed CSL upon his release from incarceration pursuant to N.J.S.A. 2C:43-6.4(b).

In a November 3, 1999 termination report, a psychologist from the ADTC found B.B. was "at low to moderate risk to reoffend."  On March 15, 2000, he was released from ADTC.  It is undisputed that he has not committed any offenses since his release.

In April 2017, James R. Reynolds, Ph.D., performed a psychosexual evaluation—actuarial risk assessment of B.B. Reynolds used the Registrant Risk Assessment Scale (RRAS) to assess B.B.'s recidivism risk level, and the STATIC-99-R, ACUTE-2007, and STABLE-2007 assessments to assess his sexual offense recidivism risk level. Reynolds noted that B.B. "was apportioned a total of [forty-one] points, entirely on static factors which places him within the moderate risk on the RRAS[.]" However, Reynolds explained that although the RRAS is used for Tier consideration, it is "is one of the least experimentally supported actuarial instruments[,]" and it "was never empirically validated for use with persons who committed the offense so many years in the past." According to Reynolds, the RRAS

> demonstrated good validity and reliability when used at the time of sentencing to probation or when a registrant is released from prison, but the long[-]term predictive validity of the RRAS has not been scientifically supported. Interpreting the RRAS in this situation must be done with caution, due to the possibility for increased measurement error.

Reynolds used the STATIC-99-R, ACUTE-2007, and STABLE-2007 to assess B.B. "due to the substantial support the instruments have received in the professional, peer-reviewed literature." He explained that these "instruments were developed to assist those who work with sexual offenders by assessing the stability of the

offender's overall functioning, using domains that implicate whether the offender's recidivism risk is increasing, decreasing, or remaining the same" and that "the risk level for all persons under [CSL] is calculated yearly on these instruments."

Reynolds found B.B. "present[ed] with no risk factors on the STATIC-99-R, as the victims were female relatives. [B.B.'s] age and the length of time remaining sexual re-offense free in the community are considered protective factors." Reynolds also found no risk factors on the STABLE-2007 or ACUTE-2007. He concluded that "[i]ntegrating the results of all three instruments results in placing [B.B] within an offender group [that] presents a 0.7% - 2% recidivism risk over the next [four] years." Reynolds opined within a reasonable degree of psychological certainty that "[B.B.] is not likely to commit another sexual offense and he does not present a risk of harm to others in the community . . . and removing him from CSL [is] clinically supported and recommended[.]"

B.B. filed a motion pursuant to N.J.S.A. 2C:43-6.4(c) to terminate his CSL.[1] The motion judge denied the motion, finding the RRAS was presumptively valid and Reynolds placed considerably more weight on the STATIC-99-R, ACUTE-2007, and STABLE-2007

---

[1] B.B. also moved pursuant to N.J.S.A. 2C:7-2(f) to terminate his obligation to register under Megan's Law. He does not challenge the motion judge's denial of that request.

4

without citing specific support for his assertion that these instruments have substantial support in professional and peer-reviewed literature. The judge also noted Reynolds did not account for the third non-relative female victim. The judge found there was a discrepancy between the RRAS, which placed B.B. at a moderate risk for re-offense, and Reynolds' reliance on the STATIC-99-R, ACUTE-2007, AND STABLE-2007 to find B.B. had a low level of risk. The judge determined that given this discrepancy, he was "not firmly convinced that B.B. is not likely to pose a threat to the safety of others if released from CSL." The judge concluded that B.B. failed to prove otherwise by clear and convincing evidence.

Reynolds reassessed B.B.'s RRAS and STATIC-99-R scores based on the third non-relative female victim. Reynolds noted that B.B. "was apportioned a total of [fifty] points, entirely on static factors, which placed him within the moderate risk level on the RRAS." Reynolds reiterated his concerns about the RRAS, and explained that:

> the instrument for Tier considerations in the [S]tate of New Jersey, the [RRAS], is one of the least experimentally supported actuarial instruments. Additionally, the instrument was never empirically validated for use with persons who committed the offense so many years in the past. It has demonstrated good validity and reliability when used at the time of sentencing to probation when a registrant is released from prison, but the long term predictive validity of the RRAS has not been scientifically supported. Interpreting the

RRAS in this situation must be done with caution, due to the possibility for increased measurement error.

Reynolds found that the information regarding the non-relative female victim

> does not change the estimates of [B.B's] sexual re-offense risk. Moreover, his score will never be within the low risk range on [the RRAS] due to static factors. Estimating [B.B.'s] risk level as always being at least moderate is not scientifically supported, as research clearly demonstrates that a registrant's risk for sexually re-offending decreases by approximately [fifty percent] for every [five]-year term they remain sexual re-offense free while at liberty in the community[.]

He also found B.B. presented one risk factor, the non-relative female victim, which placed him in the low risk range on the STATIC-99-R. He determined the ACUTE-2007 and STABLE-2007 did not identify any risk factors and concluded "based on the adjustments made to the RRAS and the STATIC-99-R, [B.B.] remain[ed] placed within an offender group that presents a 0.7% - 2% recidivism risk over the next [four] years." He provided support for his findings, and opined within a reasonable degree of psychological certainty that B.B was not likely to commit another sexual offense and did not present a risk of harm to others in the community.

B.B. filed a second motion to terminate his CSL, arguing, in part, that the preponderance of the evidence standard applied, not the clear and convincing evidence standard. The judge found that

re-scoring of the RRAS resulted in an elevation of B.B's score from forty-one to fifty, and still placed him in the moderate risk level. The judge applied the clear and convincing evidence standard and concluded that even under the preponderance of the evidence standard, defendant failed to show he posed no threat to the safety of others.

On appeal, B.B. contends the preponderance of the evidence standard applies to termination from CSL, and the application of the clear and convincing evidence standard violated the ex post facto clause. B.B. also contends the judge misapplied the use of the RRAS and abused his discretion in rejecting Reynolds' undisputed finding he was a low risk to reoffend. We need not address the standard of proof issue, as we find that under either standard, defendant was entitled to termination of CSL.

We review the court's determination on a motion to terminate CSL for abuse of discretion. See In re J.W., 410 N.J. Super. 125, 130 (App. Div. 2009) (evaluating risk of re-offense under an abuse of discretion standard). An "abuse of discretion only arises on demonstration of 'manifest error or injustice[,]'" Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) (quoting State v. Torres, 183 N.J. 554, 572 (2005)), and occurs when the trial judge's "decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Jacoby

v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012) (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

We "may find an abuse of discretion when a decision 'rest[s] on an impermissible basis' or was 'based upon a consideration of irrelevant or inappropriate factors.'" State v. S.N., 231 N.J. 497, 515 (2018) (alteration in original) (quoting State v. C.W., 449 N.J. Super. 231, 255 (App. Div. 2017)). We "can also discern an abuse of discretion when the trial court fails to take into consideration all relevant factors and when its decision reflects a clear error in judgment." Ibid. (quoting C.W., 449 N.J. Super. at 255). Similarly, "when the trial court renders a decision based upon a misconception of the law, that decision is not entitled to any particular deference and consequently will be reviewed de novo." Ibid. (quoting C.W., 449 N.J. Super. at 255). Thus, under the abuse of discretion standard, we "generally give[] no deference to a trial court decision that fails to 'provide factual underpinnings and legal bases supporting [its] exercise of judicial discretion.'" Ibid. (alterations in original) (quoting C.W., 449 N.J. Super. at 255). Applying the above standards, we conclude the judge mistakenly exercised his discretion in finding the RRAS was presumptively valid and relying on it to deny B.B.'s motion.

The RRAS was "designed to provide prosecutors with an objective standard on which to base the community notification decision mandated by [Megan's Law] and to assure that the notification law is applied in a uniform manner throughout the State." In re Registrant, C.A., 146 N.J. 71, 100-01 (1996). The RRAS "is used to assess whether a registrant's risk of reoffending is low, moderate or high." In re A.D., 441 N.J. Super. 403, 407 (App. Div. 2015). "[T]he Attorney General developed the RRAS and the Registrant Risk Assessment Manual to implement the legislative directive to provide three levels of notification depending upon the risk of re-offense." Id. at 420 (citing N.J.S.A. 2C:7-8). The RRAS

> was rationally derived by a panel of mental health and legal experts by the following process: 1) the selection of risk assessment criteria that have empirical support; 2) the [weighing] of these pertinent risk assessment criteria; and 3) the use of sample cases to assist in the setting of numerical cutoff points for low, moderate and high risk scores.
>
> [Ibid. (alteration in original) (citation omitted).]

"By analyzing the scientific literature on valid and reliable predictors of recidivism, the Committee . . . created a useful and rational scale that can be used as a tool for deciding tier classification." In re Registrant, C.A., 146 N.J. at 107. "Although the Scale has not been empirically validated through

scientific field studies, the factors that compromise the Scale have been shown to be the best indicators of risk of re-offense." Ibid.

The RRAS "is sufficiently probative and reliable to fulfill the State's burden of presenting a prima facie case." In re Registrant G.B., 147 N.J. 62, 81 (1996) (citing In re Registrant, C.A., 146 N.J. at 107). "[I]t is . . . a useful guide to determine the amount of notification that a community should receive." Id. at 69. "Thus, the Scale is presumptively accurate and is to be afforded substantial weight--indeed it will even have a binding effect--unless and until a registrant 'presents subjective criteria that would support a court not relying on the tier classification recommended by the Scale.'" Id. at 81 (quoting In re Registrant, C.A., 146 N.J. at 109). "Moreover, '[a]ny classification that is inconsistent with the classification based on the Scale is subject to judicial review by either side through appeal and any finding will have to be supported on the record.'" Ibid. (alteration in original) (quoting In re Registrant, C.A., 146 N.J. at 109).

Thus, the RRAS was developed to assist prosecutors and judges in determining a defendant's initial tier classification and notification requirements under Megan's Law, not for termination of CSL. See In re Registrant, C.A., 146 N.J. at 100-01. There

is no authority confirming the RRAS should be presumptively valid for termination of CSL. Although the RRAS may be helpful as part of a judge's determination of whether a defendant should be terminated from CSL because the scale indicates "risk of re-offense[,]" Id. at 107, a court should take a more holistic approach in evaluating whether a defendant no longer poses a risk to the community pursuant to N.J.S.A. 2C:43-6.4(c). The RRAS is a scale, which contains many stagnant factors, and a defendant's RRAS score will not change significantly despite how much time has passed re-offense free from the date of his conviction. Id. at 103-04. If we were to hold that the RRAS was presumptively valid for determining the termination of a registrant's CSL, then the termination guidelines under N.J.S.A. 2C:43-6.4(c) would be effectively null, as no registrant would ever be able to rehabilitate himself sufficiently to change his RRAS score and have his CSL terminated.

We also conclude the judge mistakenly exercised his discretion in rejecting Reynolds' undisputed finding that B.B. was a low risk to reoffend. The judge failed to consider Reynolds' findings on B.B.'s low risk score on the STATIC-99-R and no risk scores on the ACUTE-2007 and STABLE-2007. The judge also failed to consider Reynolds' explanations as to why the ACUTE-2007 and STABLE-2007 were more appropriate tests to evaluate whether B.B.

11

should be terminated from CSL. The judge ignored Reynolds' opinions that B.B.'s RRAS score will never be in the low risk range due to static factors, and that estimating B.B.'s risk level as always being at least moderate was not scientifically supported. The judge failed to appropriately and fully consider Reynolds' amended findings and reasoning as to his opinion that B.B was not likely to commit another sexual offense, did not present a risk of harm to others in the community, and should be terminated from CSL.

Reversed and remanded for entry of an order terminating defendant from CSL.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5376-16T1