# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3553-19T6

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

DAVID A. PINEIRO,

    Defendant-Respondent.

_____

Submitted June 30, 2020 – Decided July 20, 2020

Before Judges Messano, Vernoia and Rose.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Passaic County, Complaint No. W-2020-00201-1602.

Camelia M. Valdes, Passaic County Prosecutor, attorney for appellant (Mark Niedziela, Assistant Prosecutor, of counsel and on the briefs).

Adrienne D. Edward, attorney for respondent.

PER CURIAM

The State appeals from an order granting defendant David A. Pineiro's motion to reopen his detention hearing and releasing defendant from detention pending disposition of the second-degree eluding and disorderly persons possession of marijuana charges for which the court ordered his detention in the first instance. Because the court did not make sufficient findings supporting its decision to reopen the detention hearing and release defendant pending trial, we vacate the court's order and remand for further proceedings.

I.

On February 9, 2020, Clifton police arrested and charged defendant with second-degree eluding, N.J.S.A. 2C:29-2(b), and the disorderly persons offense of possession of marijuana, N.J.S.A. 2C:35-10(a)(4). The State moved for his detention pending trial.

At the detention hearing, the judge summarized a police report describing the incident leading to defendant's arrest. The report stated that on February 9, 2020, at 9:00 p.m., a Clifton police officer observed defendant driving a motorcycle at a high rate of speed and weaving in and out of traffic. The motorcycle did not have illuminated taillights or a license plate. Defendant's actions caused other motorists on the roadway to "slam on their brakes to avoid a collision" with defendant.

A-3553-19T6

The officer activated the emergency lights and siren on his marked police vehicle and pursued defendant, who increased his speed, maneuvered through traffic on Route 3, and traveled a "substantial distance" before crashing his motorcycle, suffering injuries, and being transported to the hospital. Defendant was found in possession of a marijuana cigarette. The State reported defendant's license was suspended and his motorcycle was neither registered nor insured.

The Public Safety Assessment (PSA) showed defendant was twenty-six years old, and the assessment included a score of two out of six for defendant's risk of failure to appear and a score of three out of six for his risk of new criminal activity. The PSA revealed defendant had convictions in 2011 and 2015 for second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), and received five-year prison terms for each conviction. Defendant also had 2018 and 2019 convictions for third-degree distribution of a controlled dangerous substance within 1,000 feet of school property, N.J.S.A. 2C:35-7(a), and received probationary terms for each. In August 2019, defendant was convicted of a disorderly persons offense, possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(c). Defendant had a violation of probation in December 2019, and he was on probation for his 2018 and 2019 convictions when he was arrested on the eluding charge.

3

The PSA revealed defendant did not have any prior failures to appear for court proceedings. The PSA included a recommendation of release with monthly reporting.

The State argued defendant presented a risk of flight based on the nature of the eluding charge and defendant's prior record and because defendant was on probation when the eluding offense was allegedly committed. The State also asserted defendant's prior record and his actions during his alleged flight from the police established that he posed a risk to the safety of the community if released.

Defendant's counsel asserted defendant was recently married, lived with his wife and his mother, and had significant community ties. Counsel also claimed defendant had a history of employment, defendant was about to commence new full-time employment, and defendant recently completed an educational program. Counsel explained defendant did not stop initially in response to the police pursuit because the motorcycle was loud and defendant could not hear the police car siren, and later defendant did not stop because the police were very close and he thought they would strike him. Counsel also argued defendant was concerned injuries he suffered in the crash were not

diagnosed in the hospital and defendant did not feel safe he would receive proper treatment in jail.

In a detailed bench decision, the judge found clear and convincing evidence no conditions of release would reasonably assure defendant's appearance in court and the safety of the community. See N.J.S.A. 2A:162-18(a)(2). The judge considered and addressed the information detailed in N.J.S.A. 2A:162-20.[1]

---

[1] N.J.S.A. 2A:162-20 provides that the court "may take into account" the following information in making a detention decision:

> a. The nature and circumstances of the offense charged;
>
> b. The weight of the evidence against the [presumptively] eligible defendant, except that the court may consider the admissibility of any evidence sought to be excluded;
>
> c. The history and characteristics of the eligible defendant, including:
>
> (1) the eligible defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (2) whether, at the time of the current offense or arrest, the eligible defendant was on probation, parole, or on

More particularly, the court first considered the nature and circumstances of the offense, explaining that defendant's actions in eluding the police and his exposure to a ten-year prison sentence supports a finding he presents a significant flight risk.[2]   See N.J.S.A. 2A:162-20(a).   Second, the court considered the parties' proffers and found the weight of the evidence against defendant, as detailed in the officer's incident report, was "very strong."  See N.J.S.A. 2A:162-20(b).  The court explained the officer pursued defendant in a marked police vehicle and defendant's conduct—speeding, evasive driving, and

> other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal law, or the law of this or any other state;
>
> d. The nature and seriousness of the danger to any other person or the community that would be posed by the eligible defendant's release, if applicable;
>
> e. The nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process that would be posed by the eligible defendant's release, if applicable; and
>
> f. The release recommendation of the pretrial services program obtained using a risk assessment instrument under N.J.S.A. 2A:162-25.

[2]  The court did not consider, and the State did not argue the court should consider, that based on defendant's criminal history, he is eligible as a persistent offender for an extended-term sentence of up to twenty years on the second-degree eluding charge.  See N.J.S.A. 2C:44-3(a).

6

causing other drivers to "slam on their brakes in order to avoid" colliding with him—placed others at a risk of harm.

Next, the court considered defendant's personal characteristics, his family and community ties, and his employment. See N.J.S.A. 2A:162-20(c)(1). The court noted defendant's prior criminal history, including his convictions and mandatory prison sentences in 2011 and 2015 for weapons offenses, his more recent 2018 and 2019 drug convictions, and his December 2019 violation of probation.

Fourth, the court found defendant allegedly committed the eluding offense while on probation for his prior drug conviction. See N.J.S.A. 2A:162-20(c)(2). Fifth, the court found defendant posed a risk to the community because the alleged eluding "went on for a substantial distance" during which defendant "put individuals . . . at risk of having a car crash," and, as it turned out, a crash of defendant's vehicle occurred. See N.J.S.A. 2A:162-20(d).

The court also found there was no evidence defendant posed a risk of obstructing or attempting to obstruct the criminal justice process. See N.J.S.A. 2A:162-20(e). Last, the court considered the PSA's risk assessment scores and recommendation defendant be released with monthly reporting. See N.J.S.A. 2A:162-20(f). The court disagreed with the PSA recommendation, finding

defendant posed a "significant" flight risk because of his exposure to a ten-year prison sentence on the eluding charge and the PSA recommendation did not adequately account for the weight of the evidence, that defendant was found in violation of probation in December 2019, and that defendant was serving probationary sentences on both his 2018 and 2019 convictions when the alleged eluding occurred.

The court concluded the State overcame the presumption of release by clear and convincing evidence. The court determined there were no conditions of release that could be imposed that would assure defendant would appear for future court proceedings and that would protect the safety of the community. The court entered an order granting the State's detention motion. Defendant did not appeal from the court's order.

Defendant obtained new counsel and filed a motion for reconsideration of the detention order. On March 3, 2020, a different judge heard the motion. Defense counsel reprised the arguments made during the initial hearing and also asserted defendant was unaware the police were pursuing him because his motorcycle did not have mirrors and he was wearing a full helmet that prevented him from hearing the police siren. The State argued defendant failed to provide any justification for reopening his detention hearing under N.J.S.A. 2A:162-

19(f), nothing had changed since the prior judge issued the detention order, and the evidence supported the first judge's findings and detention order.

The judge denied defendant's motion, finding defendant's arguments presented issues for a jury, and that, because a conviction for second-degree eluding would require imposition of a prison sentence, there was a risk defendant would fail to appear at future court proceedings. The court concluded it would "not reverse the" first judge's "finding."[3] Defendant did not appeal from the judge's order denying his motion for reconsideration.

On April 28, 2020, defendant filed a motion to reopen his detention hearing. Relying on his counsel's certification; medical records from the jail; and various Executive Orders, New Jersey Supreme Court orders, and publications concerning the COVID-19 pandemic; defendant claimed the pandemic, and his asthma condition, constituted a change in circumstances

---

[3] It is unclear from the record whether the court considered defendant's motion as one for reconsideration under Rule 4:49-2, or as a motion to reopen the detention hearing under N.J.S.A. 2A:162-19(f). Defendant's counsel stated he moved for reconsideration, the State argued defendant was not entitled to "reopen" his detention hearing, and the judge did not identify the legal standard he applied in denying the motion. We need not resolve the issue because defendant does not appeal from the court's March 3, 2020 determination and order.

supporting his request to reopen his detention hearing.[4] Defendant's counsel further asserted that application of health protocols and social distancing standards are not feasible in correctional institutions and defendant is in particular danger if he were to contract COVID-19. Defendant requested release on his own recognizance pursuant to N.J.S.A. 2A:162-19(f), which provides for the reopening of a detention hearing, and N.J.S.A. 2A:162-21(b), which provides for temporary release from detention for a compelling reason.

In a May 8, 2020 letter brief, the State opposed defendant's motion to reopen the record and argued "defendant [was] asking the Court to give undue weight to the [COVID]-19 virus without considering the import the virus may have on his risk of posing a danger to the community, obstructing justice, or failing to appear in court." The State also claimed that because pretrial services had suspended in-person reporting, "defendant would pose an even greater risk to the community if he were released." The State urged the court to deny release

---

[4] Defendant's April 9, 2020 records from his admission to the Bergen County jail, to which he was transferred after first being incarcerated in the Passaic County jail, showed defendant reported he had asthma; he used an inhaler twice per day to treat the asthma; he had no prior hospitalizations for asthma; and he did not experience asthma symptoms more than three times per month. The medical practitioner assessed defendant as having "possible intermittent asthma," determined defendant's asthma was under "fair to good control," and cleared defendant for general population within the jail.

because "no evidence [established] that [COVID-19] in and of itself will impact the defendant's risk of posing a danger to the community, his obstructing justice or his failing to appear in court."

After hearing argument on the motion, the same judge who denied defendant's motion for reconsideration, made the following limited findings:

> I am going to release [defendant] with conditions, and I am doing so for the following reasons. Number one, he did have a low score (indiscernible) PSA; two, we don't have any failures to appear; three, he does suffer, and the medical records indicate, that he does suffer from asthma, which is a factor that makes him more likely to contract [COVID-19] than those who don't. While he may be being treated for it in the county jail, the treatment is for his asthma. But treatment for asthma, as far as I know, does not make one immune to [COVID-19] so. And it does make him more prone to getting it because he has asthma.

The court ordered defendant released to home confinement with weekly telephonic reporting until the ban on in-person reporting was lifted, at which time defendant would be required to report in person each week. The State requested a stay pending appeal, and the court granted that request. The same day the court entered a corresponding order.[5]

---

[5] The order referred to an attachment containing written findings and reasons; however, no such findings and reasons were attached.

On May 12, 2020, the State filed an emergent application for leave to appeal. We granted the motion, continued the stay pending appeal, and included the following instruction: "The State must address and identify with particularity what specific measures are available in the County Detention Facility to accommodate defendant's medical needs without exposing him to an unreasonable risk of harm."

In response to that instruction, the State submitted a May 11, 2020, certification from Warden Steven Ahrendt of the Bergen County Sheriff's Office. The certification details the actions taken to address COVID-19 within the Bergen County Jail (the facility).

According to Ahrendt, the facility is capable of housing 1200 inmates and detainees. As of the date of the certification, "the [f]acility house[d] 123 male and 6 female [United States Immigration and Customs Enforcement (ICE)] detainees and a total of 230 county inmates." Each cell, except for those in the mental health unit, is approximately ten feet by seven feet in size and has one bunk bed for two inmates. "Apart from the beds, there is 70.6 square feet in the cells." The mental health housing unit has four individual cells containing one bed each, in addition to a large dormitory area with four rows of five bunk beds (total of forty beds) that are "spaced apart."

The facility has a medical infirmary overseen by a medical doctor as well as three part-time psychiatrists, one full-time and one part-time dentist, twelve full-time nurses, and four full-time and three part-time licensed practical nurses. "Due to the COVID-19 outbreak, additional Bergen County medical staff are . . . on-site 24/7 to provide full coverage for all detainee/inmate medical needs."

Ahrendt reported that, in response to COVID-19, the facility implemented the following changes:

    a. As of "March 13, 2020, all ICE detainee intake at the [f]acility has been suspended indefinitely."

    b. All county inmates are subject to a medical screening during intake, which includes: assessment for fever and respiratory illness; and questioning as to whether the inmate has been in contact in the past two weeks with someone who has tested positive for the virus "and whether they have traveled from or through area(s) with sustained community transmission." Those with COVID-19 symptoms will be isolated and possibly sent for testing. Those who test positive will be isolated and treated at the facility unless they require hospitalization, in which case they will be transferred to the local hospital.

    c. No social visits and tours are permitted. An inmate may meet with an attorney so long as there is no contact and a glass partition separates them. Phone conferences are permitted.

    d. Prior to entering the facility, staff and vendors must undergo a medical screening, which includes a temperature check. Those with a temperature above 100 degrees Fahrenheit are not permitted in the facility.

13

e. All staff must wear face masks inside the facility.

f. To comply with the [Center for Disease Control (CDC)] guidelines on social distancing in correctional facilities, inmates must remain inside their cells throughout the day except for a sixty-minute period when six inmates at a time are permitted to leave their cells for recreational activities and showering. The inmates "have 2643 square feet of space within the [f]acility available for recreational use" and have "ample room for" "social distancing" without "commingling."

g. If an inmate has COVID-19 symptoms or has tested positive for the virus, the inmate must remain in his or her cell and "phones will be made available in the housing unit for use by that inmate."

h. In evaluating and testing inmates, the facility follows CDC guidelines. "As such, medical staff immediately evaluate any detainees and inmates who complain of illness," and inmates may make "daily sick calls as needed." Those with symptoms "will be provided a surgical mask" and may, at the discretion of the Medical Director, be transported to the hospital for evaluation.

i. Inmates testing positive who do not need to be hospitalized are housed in the North 2 unit, which, as of March 30, 2020, has been reserved exclusively for inmates who have tested positive or are symptomatic. These inmates are housed individually in a cell with their own personal toilet and sink. Those with symptoms are housed on one side of the unit and those with confirmed tests are on the other side. "There is approximately 30-40 feet between the known positive cases and suspected positive cases in North 2. To date, there are no ICE detainees who are housed in North 2 who are symptomatic and there are three county inmates who are symptomatic, but housed in Medical." One inmate who tested positive was released from the facility on March 26, and another inmate tested positive while at the hospital undergoing treatment for an unrelated condition.

14

j. Asymptomatic inmates, excluding ICE detainees, who have been exposed to the virus are housed, or "cohorted," in a unit together for fourteen days. "If no new COVID-19 case develops in 14 days, the cohorting of these detainees will terminate."

k. Two ICE detainees tested positive for the virus and both were housed in the North 6 unit. As a result, all inmates in this unit were cohorted.

l. The facility has increased cleaning. "All housing units are sanitized no less than four times per day" and "[f]resh air is constantly circulated by opening doors and utilizing handler/vents throughout the day." To avoid congregating, all meals are eaten inside the cells. Disinfectant spray, hand sanitizer, and soap is provided in every unit. "The administration is encouraging both staff and the [f]acility general population to use these tools often and liberally."

m. "The [f]acility provides education on COVID-19 to all staff, detainees, and inmates to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting to seek medical care if they feel ill." Inmates have "daily access to sick call," and signs posted in English and Spanish throughout the facility advise inmates and staff on the "hygienic protocol" and social distancing.

n. All inmates are given surgical masks, which they must wear when outside their cells.

o. "[T]o increase disinfectant capacity throughout the agency," the sheriff's office purchased "three electric and one gas-powered fogger[s]" "to sanitize units in the jail and patrol vehicles after each shift."

p. "The [Bergen County Jail] signed a purchase order with Keefe Commissary to provide free one-time commissary benefit to all county inmates and ICE detainees. Each will get a 'food pack' and 'snack pack' free of charge."

15

Ahrendt also described the then-current status of COVID-19 cases within the facility. He noted: (a) two ICE detainees had tested positive for COVID-19, one was released on March 26, 2020, and the other was released from quarantine on April 13, 2020; (b) three inmates were suspected of having the virus and were currently on medical observation; (c) one inmate tested positive but was not currently housed at the facility; and (d) "[e]leven Bergen County Corrections Police Officers and two [n]urses who work at the [f]acility have tested positive" and were "in quarantine and are not working at the [f]acility currently."

On appeal, the State contends the court abused its discretion by reopening defendant's detention hearing and by ordering his release. Defendant argues his asthma condition and the COVID-19 pandemic constitute a material change in circumstances supporting the court's reopening of the detention hearing and the court did not abuse its discretion by ordering his release with the conditions imposed.

## II.

The Criminal Justice Reform Act (CJRA), N.J.S.A. 2A:162-15 to -26, "shall be liberally construed" to rely "primarily . . . upon pretrial release," without the use of monetary bail, to achieve three aims: to ensure that defendants appear in court, to protect the safety of the community, and to guard against

16

"attempt[s] to obstruct the criminal justice process." N.J.S.A. 2A:162-15. Where the State requests detention of a defendant entitled to the presumption of release under N.J.S.A. 2A:162-18(b), "it must establish probable cause for the offenses charged, unless the defendant has already been indicted[,]" State v. Hyppolite, 236 N.J. 154, 164 (2018) (citation omitted), and, "to rebut the presumption of release, [it] must 'prove[] by clear and convincing evidence that no release conditions would reasonably assure the defendant's appearance in court, the safety of the community, or the integrity of the criminal justice process," ibid. (quoting State v. Ingram, 230 N.J. 190, 200-01 (2017) (second alteration in original)).

We review a court's "pretrial detention decisions under the [CJRA]" under an abuse of discretion standard. State v. S.N., 231 N.J. 497, 500 (2018). Thus "the proper standard of appellate review is whether the trial court abused its discretion by relying on an impermissible basis, by relying upon irrelevant or inappropriate factors, by failing to consider all relevant factors, or by making a clear error in judgment." Ibid.

Defendant moved for relief from the court's February 13, 2020 detention order under N.J.S.A. 2A:162-19(f) and N.J.S.A. 2A:162-21(b). N.J.S.A. 2A:162-19(f) provides for the reopening of a detention hearing,

17

> at any time before trial, if the court finds that information exists that was not known to the prosecutor or the eligible defendant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the eligible defendant's appearance in court when required, the protection of the safety of any other person or the community, or that the eligible defendant will not obstruct or attempt to obstruct the criminal justice process.
>
> [N.J.S.A. 2A:162-19(f).]

In contrast, N.J.S.A. 2A:162-21(b) provides for a "temporary release" from detention of an eligible defendant "to the extent that the court determines the release to be necessary for preparation of the eligible defendant's defense or for another compelling reason."

In its decision, the court did not explain whether it granted defendant's motion under either or both statutes. On appeal, however, defendant argues the court properly granted his request to reopen his detention hearing and order his release under N.J.S.A. 2A:162-19(f). He does not contend the court's release order was proper under N.J.S.A. 2A:162-21(b), and with good reason. By its plain terms, N.J.S.A. 2A:162-21(b) permits only a "temporary release" from detention, and that is neither what defendant sought before the motion court nor what the court granted. Defendant did not seek a temporary release from pretrial detention; such a request would implicitly be for a limited period that would end

with a return to pretrial detention. Defendant sought release from detention through the disposition of his charges at trial, and that is what the court ordered. We find N.J.S.A. 2A:162-21(b) inapplicable to defendant's motion, and we do not address it further. We limit our discussion to whether the court properly reopened defendant's detention hearing and ordered his release under N.J.S.A. 2A:162-19(f).

N.J.S.A. 2A:162-19(f) "imposes a materiality standard to determine whether to reopen a detention hearing when information 'that was not known . . . at the time of the hearing' later surfaces." Hyppolite, 236 N.J. at 166. "The court may reopen the hearing if the newly revealed [information] 'has a material bearing' on whether the defendant poses a risk" of failing to appear for future court appearances, a threat to the safety of any other person or the community, or a risk that the defendant will obstruct the criminal justice process. Ibid.

A court must "examine whether there is a reasonable possibility – not probability – that the result of the [detention] hearing would have been different had the" new information been disclosed at the time of the initial detention hearing. Ibid. The materiality "standard focuses the parties and the court on whether [the information] is important to the hearing's outcome from a

19

reasonably objective vantage point." Id. at 170. The standard also places "[t]he burden . . . on the State to demonstrate that a new hearing is not required." Ibid.

"Judges retain discretion to decide whether to reopen a detention hearing" under N.J.S.A. 2A:162-19(f). Id. at 171. When a court decides a request to reopen a detention hearing, "it should provide a statement of reasons" for the decision to allow "review on appeal." Id. at 172.

Where, as here, a court decides to reopen the hearing, it "must again decide whether the State has presented clear and convincing evidence to justify detention." Ibid. That is, the court must determine if the State has presented

> clear and convincing evidence that no amount of monetary bail, non-monetary conditions of pretrial release or combination of monetary bail and conditions would reasonably assure the eligible defendant's appearance in court when required, the protection of the safety of any other person or the community, and that the eligible defendant will not obstruct or attempt to obstruct the criminal justice process.
>
> [N.J.S.A. 2A:162-18(a)(1); see also Hyppolite, 236 N.J. at 172.]

The court may consider all the information bearing on the detention decision, Hyppolite, 236 N.J. at 172; see also N.J.S.A. 2A:162-20, and must "assess[] the full body of evidence" presented and "make the required statutory findings," Hyppolite, 236 N.J. at 172. "To decide whether the State has satisfied

its burden to justify pretrial detention, 'the court may take into account . . . [t]he nature and circumstances of the offense,' '[t]he weight of the evidence,' the defendant's 'history and characteristics,' the 'nature and seriousness' of the risk of danger and obstruction the defendant presents, and Pretrial Services' recommendation." Id. at 164 (quoting N.J.S.A. 2A:162-20).

Here, the court did not make any findings in the first instance supporting its decision to reopen defendant's detention hearing. The court did not make any factual findings supporting, and did not conclude as a matter of law, that defendant's asthma, the COVID-19 pandemic, or the conditions in the jail had "a material bearing on the issue of whether there are conditions of release that will reasonably assure" defendant will appear for future court proceedings and not pose a risk to the safety of others and the community. N.J.S.A. 2A:162-19.

Additionally, the judge's scant findings supporting his release decision are limited to references to defendant's "low" PSA scores[6] and defendant's lack of any prior failures to appear. The court also made a finding that is without any

---

[6] In fact, defendant's PSA score for new criminal activity was a three, which is in the mid-range for that risk factor.

support in the record–that defendant's asthma condition makes it more likely he will contract COVID-19.[7]

In stark contrast to the detailed findings of the judge who ordered defendant's detention, the judge who ordered defendant's release did not consider, and did not make the requisite findings as to, the weight of the evidence, defendant's prior history and characteristics, the nature and seriousness of the risk of danger posed by defendant if released, and the other information identified in N.J.S.A. 2A:162-20. See Hyppolite, 236 N.J. at 165. The court also failed to consider whether the State could appropriately address the COVID-19 risks within the jail. See, e.g., Williams, 452 N.J. Super. at 22 (explaining a jail's ability to provide appropriate medical care is factor to be considered in making a detention determination for an eligible defendant with a medical issue).

---

[7] The record is bereft of any evidence that defendant's asthma condition increases his susceptibility to getting the COVID-19 virus. Moreover, the record is devoid of evidence from any medical professional that defendant's claimed asthma condition will result in an adverse outcome if he contracts COVID-19. We do not minimize the seriousness of COVID-19 for defendant or any other person. We mention the dearth of evidence only to make clear that the court's finding defendant is more likely to contract COVID-19 because he has asthma, which is central to the court's release determination, finds no support in the record. A judge's speculation about the effects of defendant's medical condition does not support a proper release decision. See State v. Williams, 452 N.J. Super. 16, 21-22 (App. Div. 2017).

"It is vital" to proper appellate review "that the trial court make the necessary findings and explain its reasons" when making detention decisions under the CJRA. State v. C.W., 449 N.J. Super. 231, 255 (App. Div. 2017). The court's failure to do so here renders it impossible to determine whether the court properly exercised its discretion in reopening the detention hearing in the first instance and ordering defendant's release in the second. The lack of findings supporting the court's decisions requires that we vacate the court's order and remand for the court to promptly reconsider defendant's motion to reopen his detention hearing.

On remand, the court shall permit the parties to make supplemental submissions to address the current status of defendant's medical condition, the circumstances in the jail, and any other matters pertinent to defendant's motion; and the court shall hear additional arguments from counsel. The court shall determine and make findings as to whether defendant is entitled to reopen his detention hearing under N.J.S.A. 2A:162-19(f). See Hyppolite, 236 N.J. at 169-72. If the court determines the hearing should be reopened, the court shall consider the record presented, including any additional submissions of the parties on remand and all relevant information under N.J.S.A. 2A:162-20. The court shall make findings supporting any release determination under N.J.S.A.

23                                                                    A-3553-19T6

2A:162-19(f).[8]   Defendant shall remain detained pending the remand court's decision on defendant's motion to reopen his detention hearing.

We do not address defendant's claim he should be released pursuant to Rule 3:21-10(b)(2), which allows for the amendment of "a custodial sentence to permit the release of a defendant because of illness or infirmity of the defendant."  The argument was not raised before the motion court, see State v. Robinson, 200 N.J. 1, 20 (2009), and the Rule is inapplicable because defendant does not seek release from service of a custodial sentence.

Vacated and remanded for further proceedings in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[8]  The record on remand shall include all prior submissions to the motion court, Ahrendt's May 11, 2020 certification, and any additional submissions made by the parties to the remand court.