# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0627-19

IN THE MATTER OF
REGISTRANT R.S.

_____

Argued May 24, 2021 – Decided August 12, 2021

Before Judges Messano, Hoffman and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. ML-18-12-0009.

David M. Liston, Assistant Prosecutor, argued the cause for appellant State of New Jersey (Yolanda Ciccone, Middlesex County Prosecutor, attorney; David M. Liston, of counsel and on the briefs).

Jonathan Edward Ingram, Assistant Deputy Public Defender, argued the cause for respondent R.S. (Joseph E. Krakora, Public Defender, attorney; Jonathan Edward Ingram, on the brief).

PER CURIAM

The State appeals from the August 27, 2019 Law Division order excluding registrant R.S.[1] from the New Jersey Sex Offender Internet Registry (Internet Registry). For the reasons that follow, we vacate August 27, 2019 order and remand for further proceedings.

I.

We begin our consideration of this appeal by reviewing the relevant provisions of the criminal code, including the Registration and Community Notification Laws, N.J.S.A. 2C:7-1 to -11 (Megan's Law) as well as the statutes concerning the Adult Diagnostic and Treatment Center (ADTC), N.J.S.A. 2C:47-1 to -10, and sex offender internet registration, N.J.S.A. 2C:7-12 to -19.

N.J.S.A. 2C:47-3 allows courts to sentence certain sex offenders to serve their terms of incarceration at the ADTC when the court finds, based on the results of a psychological examination, "that the offender's conduct was characterized by a pattern of repetitive, compulsive behavior and further reveals that the offender is amenable to sex offender treatment and is willing to participate in such treatment . . . ." N.J.S.A. 2C:47-3(a), (b). To sentence an offender to the ADTC, the court's findings must be supported by a

---

[1] We use a pseudonym for the child victim and refer to defendant by his initials to protect the victim's privacy. R. 1:38-3(c)(12).

preponderance of the evidence. In re D.F.S., 446 N.J. Super 203, 219 (App. Div. 2016) (citing State v. Howard, 110 N.J. 113, 131 (1988)).

Upon release from confinement, Megan's Law requires certain sex offenders to register with local law enforcement agencies and notify the community. In re T.T., 188 N.J. 321, 327 (2006); In re Registrant M.F., 169 N.J. 45, 52 (2001); N.J.S.A. 2C:7-2. The degree of notification required is determined by the offender's risk of re-offense. N.J.S.A. 2C:7-2(c). A registrant's risk of re-offense can fall into one of three levels: Tier I (low), Tier II (moderate), or Tier III (high). State v. C.W., 449 N.J. Super. 231, 260, (App. Div. 2017). When risk of re-offense is low, "law enforcement agencies likely to encounter the [registrant]" must be notified. N.J.S.A. 2C:7-8(c)(1). When risk of re-offense is moderate, "organizations in the community including schools, religious and youth organizations" must be notified in addition to the notice to law enforcement agencies. N.J.S.A. 2C:7-8(c)(2). When risk of re-offense is high, public notice "designed to reach members of the public likely to encounter the [registrant]" is required, in addition to the other notice required. N.J.S.A. 2C:7-8(c)(3).

"[F]or the protection of the public," N.J.S.A. 2C:7-12 to -19 creates and sets forth rules for a "sex offender central registry . . . available to the public

through the Internet" containing "information about certain sex offenders . . . ." N.J.S.A. 2C:7-12. Whether an offender's information is included on the Internet Registry depends in part on his or her risk of re-offense. N.J.S.A. 2C:7-13(b).

N.J.S.A. 2C:7-13(b) provides:

> The public may, without limitation, obtain access to the Internet [R]egistry to view an individual registration record, any part of, or the entire Internet [R]egistry concerning all offenders:
>
> 1) whose risk of re-offense is high; [or]
>
> 2) whose risk of re-offense is moderate or low and whose conduct was found to be characterized by a pattern of repetitive, compulsive behavior pursuant to the provisions of N.J.S.2C:47-3 . . . .

N.J.S.A. 2C:7-13(d) outlines limited exceptions that allow for the exclusion of certain offenders from the Internet Registry, but N.J.S.A. 2C:7-13(e) explicitly provides these exceptions do not apply "if the offender's conduct was characterized by a pattern of repetitive, compulsive behavior . . . ." As a corollary, N.J.S.A. 2C:7-13(f) states, "Unless the offender's conduct was characterized by a pattern of repetitive, compulsive behavior, the individual registration records of offenders whose risk of re-offense is low . . . shall not be available to the public on the Internet [R]egistry."

We previously interpreted the Internet Registry statute's directive "that the information of a moderate or low risk sex offender appear on the [R]egistry 'if the offender's conduct was characterized by a pattern of repetitive, compulsive behavior[,]'" and held "the decision whether such an offender's individual registration record 'shall be made available to the public on the Internet [R]egistry' depends on the nature of his sexual offenses at the time he committed them, and not on his mental condition at the time of the tier hearing." D.F.S., 446 N.J. Super. at 207-08 (quoting N.J.S.A. 2C:7-13(e)). Thus, if the sentencing court finds under N.J.S.A. 2C:47-3 that an offender's conduct was characterized by a pattern of repetitive, compulsive behavior, N.J.S.A. 2C:7-13 requires inclusion of the offender's information on the Internet [R]egistry.

In October 2014, two convicted sex offenders, on behalf of themselves and similarly situated individuals, sued New Jersey's Acting Attorney General in federal court, challenging the constitutionality of N.J.S.A. 2C:7-13. See L.A. ex rel. Z.Kh. v. Hoffman, 144 F. Supp. 3d 649 (D.N.J. 2015). The parties reached a settlement, and on March 15, 2017, the United States District Court for the District of New Jersey entered a stipulation and order requiring, in the relevant part:

> In all prospective applications of paragraph (2) of subsection b, of N.J.S.A. 2C:7-13, in order to allow the

A-0627-19

public to view on the Internet [R]egistry an individual registration record or any part thereof concerning an offender whose conduct was found to be characterized by a pattern of repetitive, compulsive behavior pursuant to the provisions of N.J.S.A. 2C:47-3 and whose risk of re-offense is moderate or low[,] . . . the State shall have the burden of establishing that the offender's conduct was characterized by a pattern of repetitive, compulsive behavior pursuant to the provisions of N.J.S.A. 2C:47-3 by clear and convincing evidence.

[ ] The Internet [R]egistry record of any offender whose conduct was found on or after July 1, 2014 to be characterized by a pattern of repetitive, compulsive behavior pursuant to the provisions of N.J.S.A. 2C:47-3 under a "preponderance of the evidence" burden of proof whose risk of re-offense is moderate or low . . . shall not be subject to public viewing on the Internet [R]egistry established pursuant to N.J.S.A. 2C:7-12 et seq. unless and until the State, in a sentencing proceeding conducted pursuant to N.J.S.A. 2C:47-3, a Megan's Law tier classification hearing or such other judicial proceeding as may be determined by the Administrative Office of the Courts, establishes by clear and convincing evidence that the offender's conduct was characterized by a pattern of repetitive, compulsive behavior.

In short, while an offender's repetitive and compulsive conduct need only be proven by a preponderance of the evidence for sentencing to the ADTC, the State must now prove a low-risk or moderate-risk "offender's conduct was characterized by a pattern of repetitive, compulsive behavior" by clear and

6

convincing evidence in order to include such an offender on the Internet Registry.

## II.

On June 12, 2013, sixteen-year-old Jane Doe (Jane) reported to the Franklin Township Police that R.S. had sexually assaulted her on multiple occasions occurring years earlier when she was between seven and nine years old. During her interview with police, Jane disclosed R.S. "digitally penetrated her vagina and performed oral sex on her during the years of 2004 through 2006" and "reported the sexual assaults occurred on approximately ten to fifteen occasions at defendant's residence . . . ."

When questioned by police, R.S. admitted to sexually assaulting Jane on at least two occasions. Police then arrested R.S., and on July 17, 2013, a Somerset County grand jury indicted R.S. on two charges: first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (count one); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count two). R.S. pled guilty to count two of the indictment on March 7, 2014.

On two dates in June 2014, Christopher Staples, Ph.D., a licensed psychologist and forensic mental health clinician, conducted a psychological

7

evaluation of R.S. to determine R.S.'s eligibility for ADTC sentencing, pursuant to N.J.S.A. 2C:47-1 to -3. According to Dr. Staples' report,

> [R.S.] stated his wife was home during the assaults but was not aware of his behavior because she was in the bedroom when they occurred. When asked if he ever told his wife about his behavior, he said he did not, because she would be angry with him. He acknowledged he kept the abuse a secret because he knew "it was bad[.]"[] After the assaults he said he felt "miserable and ashamed[,]"[] but admitted that was not enough to prevent him from committing the assaults on subsequent occasions. He said he felt like there was someone else controlling his mind, pushing him to engage in the sexually motivated behavior.

The report also discussed R.S.'s cognitive abilities. It revealed R.S. was in a car accident as a child, with resulting brain damage that "affected his cognitive ability and his speech" and caused him "difficulty learning throughout his life . . . ." Dr. Staples performed various psychological tests on R.S. that showed R.S. was in the "low" category of cognitive ability and indicated "poor" intellectual functioning. Dr. Staples further observed:

> His speech was slurred, and at times difficult to understand. Thought processes, as measured by speech, seemed to be somewhat disorganized, however he was able to provide relevant responses to questions. He often perseverated on a question or topic, repeating it out loud to himself a few times. His memory appeared to be impaired as he had difficulty providing details about his background and other aspects of his life. The inconsistencies in the information [R.S.]

A-0627-19

provided, and the difficulty he had with reporting facts regarding his background, suggest he may not be an altogether reliable informant.

However, the report indicated R.S. did not experience delusions or hallucinations and did not have a psychotic thought disorder or a neurological impairment.

R.S. denied an interest in child pornography and "denied feelings of sexual attraction to children, other than attraction to the victim of the present offense." The report further provided that he scored a zero on a test assessing the risk of re-offense.

Dr. Staples' report concluded:

> [R.S.]'s repetitive criminal sexual behavior was performed compulsively. He said he knew what he was doing was wrong, and although he felt "miserable and ashamed" about his actions, he was not able to stop himself from engaging in the behavior on subsequent occasions. Furthermore, he said he kept this behavior a secret from his wife for fear she would be angry with him, yet engaged in the sexual misconduct when his wife was in another room of the residence. This suggests that he was not able to control the compulsion to engage in the behavior.

> Given the repetitive, compulsive elements of his behavior, [R.S.] is eligible for sentencing under the purview of the New Jersey Sex Offender Act. Despite his cognitive limitations, I believe he is amenable to treatment, and he said he would be willing to participate in the program of sex offender therapy at the Adult

9

Diagnostic and Treatment Center (ADTC). Placement in a group with other individuals who have cognitive limitations should provide a treatment setting that he can benefit from.

On August 6, 2014, the sentencing court found R.S.'s "conduct was characterized by a pattern of repetitive and compulsive behavior[,]" R.S. was "amenable to sex offender treatment[,]" and R.S. was "willing to participate in sex offender treatment." Thus, the court found the requirements under N.J.S.A. 2C:47-3 for ADTC sentencing were met and sentenced R.S. to a five-year term at the ADTC.

R.S. was released in August 2017, and when registering as a sex offender, R.S. reported that he planned to reside in Middlesex County. The Middlesex County prosecutor's office proposed that R.S. be classified as a Tier II (moderate risk) sex offender and accordingly included on the sex offender Internet Registry, pursuant to N.J.S.A 2C:7-13(b)(2).

In June 2018, R.S. filed a formal opposition to the State's proposed tier classification and inclusion of R.S.'s information on the Internet Registry. In response, the State agreed to lower R.S.'s proposed classification from Tier II to Tier I (low risk). However, the State maintained its position that because the sentencing court found R.S.'s conduct was "characterized by a pattern of repetitive, compulsive behavior" at sentencing in August 2014, N.J.S.A. 2C:7-

13 required the inclusion of R.S.'s information on the Internet Registry. R.S. opposed adding his information to the Internet Registry on two bases: 1) the State failed to meet its burden of establishing his crimes were "characterized by a pattern of repetitive and compulsive behavior[,]" and 2) "it is unconstitutional to subject an individual to mandatory inclusion on the Internet [r]egistry when that person is found clearly and convincingly to pose a low risk of sex offense recidivism."

The trial court heard argument on these issues on November 8, 2018, March 22, 2019, and July 23, 2019. In addition, the parties presented expert witness testimony and other evidence during the March 22 hearing.

After the trial court recognized him as an expert in clinical psychology, Dr. Staples testified on behalf of the State regarding his 2014 evaluation of R.S. Dr. Staples defined "compulsivity as an irresistible urge to perform some type of behavior" and stated

> compulsive sexual behavior . . . . means that the individual has intense sexual fantasy, urge, or behavior that they feel that they are not able to control.
>
> Usually, the behavior results in some type of release of tension or of some type of gratification. But oftentimes, it's also accompanied by a sense of guilt and shame. The individual engages in the behavior knowing that it's wrong and that it has certain consequences. Those consequences could be the loss

11

of important relationships, legal consequences, as well as financial and a range of other consequences that may come . . . but they generally feel unable to stop themselves . . . .

Explaining his previous finding that R.S.'s "behavior at the time was compulsive[,]" Dr. Staples testified:

[A] few things . . . stuck out to me that gave me the impression that he was certainly compulsive and not able to stop his behavior. One was that when he was offending against the victim . . . it was in the living room of his residence. And the victim had reported that her sister was also in the room at . . . several occasions where . . . the victim was abused.

And you know, one consideration in that is that certainly that's a situation that could easily be discovered, it could easily be reported, being that there's somebody else seeing the behavior occurring.

Second of all, [R.S.] had indicated that – at the time of the interview that his wife was also in the residence. She might have been in the bedroom or another room. But he indicated to me at the time of the evaluation that he knew his conduct was wrong, he knew it was – it was bad, and that if his wife were to find out, that she would be angry, she would be upset. So, that seemed important to him, and yet he . . . was compelled to perform this behavior despite the fact that . . . his wife was in the residence.

Furthermore, [R.S.] had admitted to me at the time of the interview that after he had offended, he would always feel guilty, ashamed, he would feel miserable. But that . . . in and of itself wasn't really enough to stop his behavior.

12

And then at some point during the course of . . . the offending, one of the assaults became . . . known to the victim's mother. And from everything that I had reviewed and had talked to [R.S.] about, that the . . . mother had – I guess had talked with [R.S.'s] family. The concern was expressed, but there was a . . . determination not to take it to the authorities, due to the fact that I think at the time there was some concern that it would cause significant hardship.

So even though that the victim's mother became aware and obviously the real risk of it, you know, potentially being reported to authorities, even after that situation, that was not enough to stop his behavior. There were more incidents of sexual abuse after that.

. . . .

[R.S.] had also said to me at one point during the interview that . . . even though he knew it was wrong, even though he felt miserable and ashamed about it, he kind of felt as if there was somebody in his head controlling him and telling him or forcing him to kind of engage in this behavior.

And that really struck me as being, you know, kind of indicative of what we look at in terms of compulsive . . . sexual behavior; that is, it is something that the individual feels driven to do, despite the consequences, despite the . . . potential harm that can come, that that drive is that strong.

So taking all of those factors into consideration, my determination was that that was certainly compulsively driven.

13

Dr. Staples stated the conclusions in his 2014 report were made with a reasonable degree of clinical certainty and that he was "very confident that [R.S.'s] behavior was compulsively driven."

On cross-examination, counsel for R.S. suggested his client's conduct was controlled and opportunistic, rather than compulsive, as Jane was in R.S.'s presence for several hundred days, yet R.S. only assaulted her about fifteen times. Dr. Staples responded:

> Well, we're not even taking into account days where he might have been working, days where there may have been other events happening. So, I don't think that it would be such a clear-cut determination to say that just because it happened [ten] to [fifteen] times over a two-year period suggests that he had some level of control or that the behavior was not compulsive. There may have been a number of other factors that may have interfered with that.
>
> . . . .
>
> I think that . . . draws on a number of factors that may or may not be true in terms of saying that it's about him controlling his behavior or not. There's a number of individuals that commit sexual offenses that are compulsively driven that don't necessarily commit their offenses every single day.
>
> And for the reasons why they don't commit an offense on a given day, there's . . . kind of a long list of possibilities that, you know, are more than just whether he could control himself at the time.

14

The court asked Dr. Staples if treating an offender at the ADTC "minimize[d] or reduce[d] the chance that any conduct in the future by the defendant would be or could be characterized as repetitive, compulsive[.]" Dr. Staples replied,

> "from a treatment point of view, . . . this will be a lifelong challenge for them, that compulsivity . . . and the . . . drive to commit . . . that offense or engage in that type of behavior may always be there.
>
> Now, that's not something that's static. That . . . can fluctuate and change as time, you know, goes on. Whether treatment diminishes that or not, I don't think we have direct empirical evidence to say one way or the other.

Dr. Staples agreed with the court's assessment that the ADTC does not cure offenders, but they "leave the program as just simply being people who are in possession of tools that they could use, avail themselves to . . . . further resist their [compulsions]."

R.S. called two experts: Dr. James Reynolds, Ph.D., a psychologist who had recently performed a psychological assessment of R.S., and Dr. Kristen Zgoba, Ph.D., a professor and former Research Director of the New Jersey Department of Corrections.

The court recognized Dr. Reynolds "as an expert in the field of risk evaluation and treatment of sex offenders." Dr. Reynolds testified that

15

"compulsivity . . . is considered a dynamic risk factor. And by that we mean that it's a factor that can be changed over time and with some effort." He stated that an offender could "be classified as repetitive and compulsive at one point in their life but not another[.]" Dr. Reynolds further testified that a person designated as repetitive and compulsive does not relate to an increased risk of re-offending. About R.S., Dr. Reynolds stated, "at this time . . . he is not evidencing a compulsive sexual behavior pattern[,]" and "he presents a low risk for sexually re-offending." This opinion was based on "[t]he absence of any re-offending or continued offending after he desisted."

Dr. Zgoba was qualified as an expert in criminology and empirical research. She testified that she "believe[d] that sex offender risk changes over time" and "[t]his opinion is backed by the abundance of research on the topic of risk." Dr. Zgoba clarified that "[t]he fact that [offenders a]re repetitive and compulsive does not change that opinion." Dr. Zgoba then discussed two studies she conducted that revealed sex offenders sentenced to the ADTC were less likely to reoffend than those sentenced to prison. Her 2003 study showed that offenders "classified as repetitive and compulsive" and thus sentenced to the ADTC "had recidivism re-arrest rates of 8.6 over the [ten]-year period" while "[g]eneral population sex offenders had . . . re-offense rates, same count, same

16

measure, of 12.7 percent."  Her 2008 study focused only on ADTC offenders, which similarly found their "re-offense rates for sexual offending were . . . about [nine] percent."

On August 27, 2019, the trial court ordered R.S. "is rated as a Tier 1 offender and will <u>not</u> be included on the Internet Registry."  (emphasis added). In its accompanying written opinion, the court explained R.S. would not be included in the Internet Registry because the State failed to carry its burden of showing, by clear and convincing evidence, that R.S.'s offending conduct was repetitive <u>and</u> compulsive.  While the court recognized R.S.'s offending conduct was repetitive, having indisputably occurred more than once, the court determined the State fell short of clearly and convincingly proving R.S.'s behavior was compulsive.

The trial court acknowledged that Dr. Staples found R.S.'s behavior compulsive based on Dr. Staples' definition of "compulsivity as the 'irresistible urge to perform some kind of behavior.'"  However, the court found the evidence in the record was insufficient to establish that R.S.'s behavior met Dr. Staples' definition of compulsivity.  The court stated the record did not clearly and convincingly show that R.S. "experienced 'irresistible' urges" or that R.S. was

A-0627-19

not "able to resist committing the offenses." Instead, the court found R.S.'s "actions demonstrate calculated conduct rather than compulsion."

Specifically, the trial court stated that R.S. "was able to control his impulses" because "[h]e apparently deliberately waited until he knew his wife would not see him" to assault Jane. Further, the court found the R.S. "did not feel a compulsion to offend every time the victim was in his presence" because he only committed the offenses three to fifteen times despite Jane being in his presence almost daily for at least two years, as R.S.'s wife babysat her every day. Thus, R.S. "apparently chose when to offend, making his behavior more deliberative and planned in nature." R.S. "also stopped offending before he was apprehended[,]" which would "be almost impossible" if R.S.'s conduct was compulsive. Finally, the court noted that Dr. Staples' conclusion was not dispositive because Dr. Staples found R.S.'s admissions unreliable yet still relied on R.S.'s statements indicating he felt like someone else was controlling him.

After determining R.S.'s information would be excluded from the Internet Registry, the trial court addressed R.S.'s constitutional challenge to N.J.S.A. 2C:7-13. The court acknowledged that it had developed an evidentiary record to allow for the issue to be considered "in the event of appeal." The court further stated that N.J.S.A. 2C:7-13 "may violate a low-risk offender's substantive due

18

process rights and his right to privacy" because the statute was purposed "to protect the community from a specific subset of low-risk offenders . . . whose repetitive and compulsive tendencies make them a greater risk to the public[,]" but "its current construction does not accomplish this narrow goal. It only protects against those who were, at one time, repetitive and compulsive. It does not account for a registrant's current risk." However, because the court had excluded defendant from the Internet Registry, the court stated it would "not offer an opinion on the constitutionality" of N.J.S.A. 2C:7-13 as "the issue [was] not ripe . . . ." Rather, "[a] court with more authority than this one w[ould] determine whether [N.J.S.A. 2C:7-13] violate[s] low-risk offenders' constitutional rights."

The State now appeals the trial court's August 27, 2019 order that mandated R.S. not be included on the Internet Registry and presents the following point of argument for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED BY DISREGARDING AN UNCONTROVERTED EXPERT OPINION AND FINDING THAT R.S.'S SEXUAL OFFENSES WERE NOT CHARACTERIZED BY A PATTERN OF REPETITIVE, COMPULSIVE BEHAVIOR; THE RESULTING ORDER EXCLUDING R.S. FROM THE SEX OFFENDER INTERNET REGISTRY MUST BE REVERSED.

"[T]he ultimate determination of a registrant's risk of reoffense and the scope of notification is reserved to the sound discretion of the trial court." In re Registrant G.B., 147 N.J. 62, 79 (1996). In turn, when reviewing a trial court's finding that the State failed to meet its burden of proof to show a low-risk offender's conduct was "characterized by a pattern of repetitive, compulsive behavior," we apply a well-established standard of review. "We give deference to the findings of the trial judge where . . . his findings [are] supported by the record. State v. N.G., 381 N.J. 352, 365 (2005) (citing State v. Locurto, 157 N.J. 463, 471 (1999)). Such deference is appropriate because the trial court has had the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964).

On the other hand, our review of a trial court's legal conclusions and statutory interpretation is plenary. State v. Handy, 206 N.J. 39,45 (2011); State v. Nance, 228 N.J. 378, 393 (2017). Likewise, "when the trial court renders a decision based upon a misconception of the law, that decision is not entitled to any particular deference and consequently will be reviewed de novo." State v. C.W., 449 N.J. Super. at 255. Ultimately, "an appellate court 'may find an

abuse of discretion when a decision "rest[s] on an impermissible basis" or was "based upon a consideration of irrelevant or inappropriate factors."'" Ibid. (quoting State v. Steele, 430 N.J. Super. 24. 34-35 (App. Div. 2013)).

On appeal, the State argues the trial court's finding that R.S.'s conduct was not compulsive was "based on a misconception of the law . . . ." We agree, and remand the case to the trial court to determine whether the State met its burden of proving R.S.'s conduct was "characterized by a pattern of repetitive, compulsive behavior" under the correct legal standard, which we delineate below.

The criminal code "neither defines the terms 'repetitive' or 'compulsive,' nor does it explain the meaning of 'a pattern of repetitive, compulsive behavior.'" N.G., 381 N.J. Super. at 359. However, in N.G., against a void for vagueness challenge to N.J.S.A. 2C:47-3, the ADTC sentencing statute, we employed the well-established principles of statutory interpretation to define the terms repetitive and compulsive. Id. at 361. We determined, "[t]he term 'compulsive,' is defined as 'caused by obsession or compulsion,' with 'compulsion' meaning 'an irresistible impulse to act irrationally.'" Ibid. (quoting Webster's II New Riverside Dictionary 292 (1994)). Also acceptable was the Law Division's definition in another case, defining compulsive "as 'having to do with, caused

21

by, or suggestive of psychological compulsion or obsession.'" Ibid. (quoting State v. Hass, 237 N.J. Super. 79 (Law Div. 1988)).

Discussed earlier, we recently interpreted the Internet Registry statute's directive "that the information of a moderate or low risk sex offender appear on the [R]egistry 'if the offender's conduct was characterized by a pattern of repetitive, compulsive behavior.'" D.F.S., 446 N.J. Super. at 207-08 (emphasis omitted) (quoting N.J.S.A. 2C:7-13(e)). Noting N.J.S.A. 2C:7-13(b)'s reference to N.J.S.A. 2C:47-3, the ADTC sentencing statute, and the "[n]early identical language" used, we found "the terms 'repetitive' and 'compulsive' are to be based on findings made under N.J.S.A. 2C:47-3." D.F.S., 446 N.J. Super. at 215, 214. We emphasized the familiar principle that "a word or phrase should have the same meaning throughout [a] statute in the absence of a clear indication to the contrary." Id. at 215-16 (quoting Perez v. Pantasote, Inc., 95 N.J. 105, 116 (1984)). Therefore, we define the term "compulsive" as used N.J.S.A. 2C:7-13 the same as we did in N.G., 381 N.J. Super. at 361.

Crucially, we also stated in D.F.S. that "[t]he conduct referred to in the above quoted language is the conduct exhibited in committing the offense." Id. at 215. Therefore, based on our decisions in D.F.S. and N.G., the proper question for the trial court to consider was whether the conduct R.S. exhibited

in committing the sexual assaults, i.e., his criminal conduct, was characterized by a pattern of behavior caused by obsession or an irresistible impulse to act irrationally.

The trial court did not consider the proofs under this standard. Rather than focusing only on whether the assaults R.S. inflicted on the victim were compulsive, the court examined whether the entirety of R.S.'s behavior was compulsive from the time the assaults began until his arrest years later.

The court relied on the fact that R.S. waited until his wife left the room before assaulting the victim, "did not feel a compulsion to offend every time the victim was in his presence[,]" and "stopped offending before he was apprehended." However, moments where R.S. did not commit any offense are irrelevant to determining whether R.S.'s assaults were caused by compulsions. The statute does not require offenders feel compelled to offend at all times nor does it mandate offenders have no ability to resist their temptations. Inclusion on the Internet Registry depends solely on whether the offender's sex crimes were caused by compulsions, not whether he or she was able to resist or control those impulses in other instances.

We therefore remand the case to the trial court to evaluate only whether R.S.'s "conduct exhibited in committing the offense[s]" was compulsive,

warranting the inclusion of his information on the Internet Registry. In remanding, we infer no view as to the what the outcome of the remand should be, mindful of the State's elevated burden of proof, the evidence showing R.S.'s low cognitive abilities made his admissions unreliable, and the fact that the trial court has the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Johnson, 42 N.J. at 161.

## IV.

While arguing that we should affirm his exclusion from the Internet Registry, R.S. requests we consider his constitutional challenge to N.J.S.A. 2C:7-13.[2] As noted, the trial court heard argument and expert testimony on R.S.'s constitutional claims, yet declined to rule on the issue because its decision to exclude R.S. from the Internet Registry rendered R.S.'s constitutional claims unripe. R.S., however, argues his constitutional challenge meets the "capable of repetition yet evading review" exception to the mootness doctrine.[3]

---

[2] R.S. raises procedural and substantive due process, equal protection, and fundamental fairness claims.

[3] The trial court's decision resulted in R.S. lacking standing to challenge the constitutionality of N.J.S.A. 2C:7-13 because R.S. was not included on the Internet Registry and therefore suffered no harm. It did not render the issue of the statute's constitutionality moot because the statute remains in effect and other offenders are subject to the Registry. The "capable of repetition"

24

Because we remand this case for the trial court to reconsider whether R.S. will be included on the Internet Registry under the proper legal standard, we decline to address R.S.'s constitutional claims at this stage. Whether R.S. has standing to challenge the constitutionality of N.J.S.A. 2C:7-13 will depend on the trial court's Registry decision on remand.

Moreover, even if we found the trial court did not err in its Registry decision, a remand would still be necessary to facilitate proper appellate review of R.S.'s constitutional claims. Rule 1:7-4 requires a judge in a non-jury proceeding to make findings of fact and state conclusions of law. In the absence of findings or conclusions, we are "unable to perform [our] appellate review function." T.M. v. J.C., 348 N.J. Super. 101, 106-07 (App. Div. 2002). See also Twp. of Reading v. Solberg Aviation Co., 409 N.J. Super. 282, 303 (App. Div. 2009) (describing how a lack of findings not only hampers the resolution of the case, but also affects the appellate courts' ability to properly review the trial

_____

exception applies to moot issues, not when a party lacks standing to assert a claim. "Ordinarily, a litigant may not claim standing to assert the rights of a third party. However, standing to assert the rights of third parties is appropriate if the litigant can show sufficient personal stake and adverseness so that the [c]ourt is not asked to render an advisory opinion." Jersey Shore Med. Ctr.-Fitkin Hosp. v. Est. of Baum, 84 N.J. 137, 144 (1980) (internal citations omitted). If R.S. remains excluded from the Internet Registry, we discern no personal stake or adverseness to confer him standing to challenge the constitutionality of N.J.S.A. 2C:7-13.

A-0627-19

court decision); <u>Rutgers Univ. Student Assembly (RUSA) v. Middlesex Cnty. Bd. of Elections</u>, 438 N.J. Super. 93, 107 (App. Div. 2014) (reversing a decision rejecting a plaintiff's constitutional challenge "[b]ecause the trial judge failed to provide the findings of fact and conclusions of law required by <u>Rule</u> 1:7-4(a)").

The trial court did not decide whether N.J.S.A. 2C:7-13 was constitutional. We therefore decline to make findings on the evidence presented by R.S. concerning the statute's constitutionality or make any conclusion as to whether this evidence shows N.J.S.A. 2C:7-13 is unconstitutional. <u>See</u> <u>Duddy v. Gov't Emps. Ins. Co.</u>, 421 N.J. Super. 214, 221 (App. Div. 2011) (declining to decide "in the first instance" a question not addressed by the trial court). The trial court shall address and decide R.S.'s constitutional arguments on remand if necessary.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0627-19